## HOGUET REAL ESTATE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60319. Filed June 12, 1958.

*Carter T. Louthan, Esq.*, for the petitioner.
*John F. Walsh, Esq.*, for the respondent.

The respondent determined the following deficiencies in income tax of the petitioner:

| Year | Deficiencies |
|---|---|
| 1950 | $6, 779. 36 |
| 1951 | 5, 140. 49 |
| 1952 | 6, 487. 12 |

Petitioner claims an overpayment in income tax for the year 1950 in the amount of $2,755.06. Respondent concedes that petitioner is entitled in 1952 to a net operating loss carryback deduction from 1953 in the amount of $3,786.91.

The issues are:

(1) Whether 6 per cent 20-year debenture bonds in the amount of $600,000 issued by petitioner represent a genuine indebtedness so that interest accrued thereon is deductible under section 23 (b) of the Internal Revenue Code of 1939, and

(2) If the interest on such bonds is not deductible, whether there was an indebtedness due from Oaklawn Corporation to petitioner which became worthless in 1953 so as to give rise to a net operating loss carryback to 1952.

### FINDINGS OF FACT.

Most of the facts have been stipulated and are found accordingly.

The petitioner is a New York corporation with its principal place of business at 415 Lexington Avenue, New York, New York. Its certificate of incorporation was filed on March 25, 1938, and provided, *inter alia*, for authorized capital stock of 1,200 shares of the par value of $10 each, all of the same class, and for a board of directors of not less than three and not more than ten members to be fixed by the bylaws. The first meeting of the incorporators was held on March 30, 1938.

The returns for the periods here involved, the calendar years 1950, 1951, and 1952, and the return for the year 1953, were filed with the collector of internal revenue for the third district of New York for the first 2 years and with the director of internal revenue for the Upper Manhattan district of New York for the last 2 years.

On March 31, 1938, Robert L. Hoguet, Rene E. Hoguet, Marie H. Ramee, and Marguerite M. Hoguet, who were brothers and sisters, and Helen G. Hoguet, who was a sister-in-law of each of them, each owned an undivided one-sixth interest in certain real and personal properties, and the remaining one-sixth interest was held collectively by Christine Hoguet and the executors and trustees of the last will and testament of Ramsay Hoguet, who had died on August 31, 1937. For some years the properties had been operated as a joint venture under the name of Hoguet Heirs.

Under date of March 30, 1938, Robert L. Hoguet, Marie H. Ramee, Marguerite M. Hoguet, Rene E. Hoguet, and Helen G. Hoguet made a written offer to petitioner to transfer their five respective one-sixth undivided interests in lots Nos. 11 to 30 and 44 to 56 in the city of Yonkers to Oaklawn Corporation and to transfer to petitioner their five respective one-sixth undivided interests in all other real and personal property then being administered by Hoguet Heirs (including their interests in stock of Oaklawn Corporation, but excluding their interest in an account receivable due from Helen G. Hoguet in the amount of $31,000) for the account of such persons, in exchange for the assumption by petitioner of each of the transferor's share of the indebtedness of Hoguet Heirs (except accounts payable to Marguerite M. Hoguet, Christine Hoguet, Robert L. Hoguet, Marie H. Ramee, and Joseph R. Ramee in the aggregate amount of $11,500) and the delivery to each of the transferors of 200 shares of capital stock of petitioner and $100,000 face amount of petitioner's 6 per cent 20-year debenture bonds. That offer was unanimously accepted by petitioner's board of directors at its first meeting on March 30, 1938.

On March 30, 1938, Christine Hoguet who had an undivided interest in the remaining one-sixth undivided interest in Hoguet Heirs, which had formerly belonged to Ramsay Hoguet, deceased, and who was co-executrix of his estate, was out of the country. On March 30, 1938, petitioner's board of directors adopted resolutions authorizing its officers to offer to acquire the remaining one-sixth undivided interest in such properties being administered by Hoguet Heirs from Christine Hoguet, individually and from Christine Hoguet and City Bank Farmers Trust Company, as executors and trustees under the will of Ramsay Hoguet, deceased, upon substantially the same terms and conditions as it had acquired the other five undivided interests in such properties.

On April 26, 1938, petitioner made an offer to Christine Hoguet, individually, and to Christine Hoguet and City Bank Farmers Trust Company, as executors and trustees under the will of Ramsay Hoguet, deceased, to issue to them 200 shares of capital stock, $100,000 principal amount of its 6 per cent 20-year debenture bonds and to assume their share of the liabilities of Hoguet Heirs (except accounts payable to Marguerite M. Hoguet, Christine Hoguet, Robert L. Hoguet, Marie H. Ramee, and Joseph R. Ramee in the aggregate amount of $11,500) in exchange for the transfer to Oaklawn Corporation as of April 1, 1938, of an undivided one-sixth interest in lots Nos. 11 to 30 and 44 to 56 in the city of Yonkers and the transfer to petitioner as of April 1, 1938, of their one-sixth undivided interest in all other real and personal property (except an account receivable due from Helen G. Hoguet in the amount of $31,000) which had been administered by Hoguet Heirs prior to April 1, 1938. Such offer was duly accepted on April 26, 1938.

Opening entries, recorded on petitioner's books as of April 1, 1938, may be summarized as follows:

| | | |
|---|---:|---:|
| Accrued rents receivable | $2,889.00 | |
| Bond and mortgage receivable—2419 First Ave., N. Y. C. | 18,625.00 | |
| Refrigerators | 26,189.08 | |
| Land and buildings | 2,313,982.42 | |
| Cash in bank | 26.32 | |
| Petty cash | 9.33 | |
| Accounts receivable—Oaklawn Corp | 32,062.44 | |
| Prepaid discount on bank loans | 57.75 | |
| Prepaid ground rent | 116.67 | |
| Prepaid insurance | 6,893.17 | |
| Stock of Oaklawn Corp. (45 shares) | 9,473.71 | |
| Organization expense: | 71.50 | |
|    To Hoguet Heirs | | $2,410,396.39 |
|       To credit vendor association with book value of assets taken over and to set up assets on corporation's books | | |
| Hoguet Heirs | 1,746,335.24 | |
|    To: Accounts payable | | 84,894.97 |
|      Accrued interest—mortgages | | 14,739.05 |
|      Accrued interest—accounts payable | | 1,673.46 |
|      Mortgages payable | | 1,195,057.50 |
|      Loan payable—Corn Exchange Bank | | 17,000.00 |
|      Advance rents | | 1,318.00 |
|      Reserves for depreciation: | | |
|        Buildings | | 411,026.80 |
|        Refrigerators | | 13,527.96 |
|        Mortgage—2419 First Ave | | 1,862.50 |
|      Tenants rental security | | 5,235.00 |
|        To charge vendor association for liabilities assumed and reserves taken over by the corporation and to set up the liabilities and reserves on the corporation's books | | |

Hoguet Heirs, vendors_____ $664, 061. 15
    To capital stock, common, $10 par, each author-
        ized and outstanding 1,200 shares, at par_____ $12, 000. 00
    20-year 6 per cent debenture bonds due Jan. 1,
        1958, at par_____ 600, 000. 00
    Capital surplus_____ 52, 061. 15
        To record issue of capital stock and debenture bonds, at par value, to Hoguet
        Heirs for net equity received from them and to credit capital surplus for
        excess equity over books value of capital stock and debentures issued to
        Hoguet Heirs or to their nominees.

The balance sheets of Hoguet Heirs and of the petitioner as of March 31, 1938, and April 1, 1938, respectively, as taken from the stipulation of the parties, may be summarized in comparative fashion as follows:

| *Assets* | *Hoguet Heirs* | | *Petitioner* |
|---|---|---|---|
| Cash in bank and on hand | | $35. 65 | $35. 65 |
| Rent receivable | | 2, 889. 00 | 2, 889. 00 |
| Real estate: | | | |
|     Land | $986, 657. 11 | | $986, 657. 11 |
|     Buildings | 1, 327, 325. 31 | | 1, 327, 325. 31 |
|     Total | 2, 313, 982. 42 | | 2, 313, 982. 42 |
| Less: Reserve for depreciation of buildings | 411, 026. 80 | | 411, 026. 80 |
| | 1, 902, 955. 62 | | 1, 902, 955. 62 |
| Less: Mortgages payable | 1, 195, 057. 50 | | 1, 195, 057. 50 |
| | | 707, 898. 12 | 707, 898. 12 |
| Refrigerators | 26, 189. 08 | | 26, 189. 08 |
| Less: Reserve for depreciation | 13, 527. 96 | | 13, 527. 96 |
| | | 12, 661. 12 | 12, 661. 12 |
| Oaklawn Corp. stock—book value | | 9, 473. 71 | 9, 473. 71 |
| Advanced to Oak-lawn Corp | | 32, 062. 44 | 32, 062. 44 |
| Mortgage receivable—2419 First Avenue | 18, 625. 00 | | 18, 625 00 |
| Less: Market discount | 1, 862. 50 | | 1, 862. 50 |
| | | 16, 762. 50 | 16, 762. 50 |
| Prepaid and deferred charges | | 7, 139. 09 | 7, 139. 09 |

| Assets | Hoguet Heirs | | Petitioner |
|---|---|---|---|
| Other advances receivable: | | | |
| Helen G. Hoguet | $31, 000. 00 | | |
| Van Cortlandt Realty Co | 125. 00 | | |
| Total assets | 820, 046. 63 | | $788, 921. 63 |

| Liabilities and capital | | | |
|---|---|---|---|
| Loan payable: | | | |
| Corn Exchange Bank | $17, 000. 00 | | $17, 000. 00 |
| Tenants' rental security | 5, 235. 00 | | 5, 235. 00 |
| Accounts payable | 84, 894. 97 | | 84, 894. 97 |
| Accrued interest payable: | | | |
| Mortgages | | $14, 739. 05 | $14, 739. 05 |
| Accounts payable | | 1, 673. 46 | 1, 673. 46 |
| | 16, 412. 51 | | 16, 412. 51 |
| Rents received in advance | 1, 318. 00 | | 1, 318. 00 |
| Advances payable: | | | |
| Marguerite M. Hoguet | 6, 500. 00 | | |
| Christine Hoguet | 1, 300. 00 | | |
| Robert L. Hoguet | 2, 700. 00 | | |
| Joseph R. Ramee | 400. 00 | | |
| Marie H. Ramee | 600. 00 | | |
| Surplus | 683, 686. 15 | | |
| Outstanding bonds: | | | |
| 20-year 6 per cent debenture bonds due 1/1/58 | | | 600, 000. 00 |
| Capital stock—authorized and outstanding: | | | |
| 1200 shares, $10 par value | | | 12, 000. 00 |
| Capital surplus | | | 52, 061. 15 |
| Total liabilities and capital | 820, 046. 63 | | 788, 921. 63 |

The account receivable due from Helen G. Hoguet to Hoguet Heirs in the amount of $31,000 was paid by Helen G. Hoguet by the delivery to Hoguet Heirs of bonds of petitioner of the face value of $31,000. Hoguet Heirs used $11,500 face amount of such debenture bonds of petitioner to pay the following accounts payable:

Marguerite M. Hoguet_____ $6,500
Christine Hoguet_____ 1,300
Robert L. Hoguet_____ 2,700
Marie H. Ramee_____ 600
Joseph R. Ramee_____ 400

Hoguet Heirs distributed $19,200 of such debenture bonds in liquidation by distributing $3,200 face amount thereof to each of the persons owning the six undivided interests in Hoguet Heirs. Hoguet Heirs sold the remaining $300 face amount of such debenture bonds for $300 and distributed $50 to each of the holders of such undivided one-sixth interests.

The depreciated book value of the real properties (consisting of apartment buildings, tenements, rooming houses, lofts, stores, and 23 vacant lots) transferred by Hoguet Heirs to petitioner as of April 1, 1938, the mortgages to which such properties were subject, the assessed value for local real property taxation as of April 1, 1938, the value as of August 31, 1937 (the date of death of Ramsay Hoguet) as determined for Federal estate tax purposes, the fair market value of the properties as of April 1, 1938, and the net income realized from the properties for 1937, 1938, and 1939, are as follows:

| Description of property | Book value | Mortgage | Assessed value | Estate tax value Ramsay Hoguet | Fair market value Apr. 1, 1938 | Net income | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 1937 | 1938 | 1939 |
| 3921–39 Broadway Hamlet Wilton_____ | $684,021.85 | $447,500.00 | $630,000 | } $755,000 | $475,000 | ($2,205.01) | ($5,760.40) | $4,803.58 |
| 3301–19 Broadway Broadway and 133d St____ | 282,258.42 | 173,750.00 | 270,000 | | 206,000 | 738.26 | 2,186.11 | (4,695.65) |
| 1403/5 Third Ave_ | 43,417.04 | 39,207.50 | 50,000 | Not valued | 40,000 | ---------- | ---------- | 1,265.73 |
| 1391–1401 Third Ave. 3d Ave. and 79th St_____ | 200,090.85 | 200,000.00 | 262,000 | 240,000 | 245,000 | 2,399.67 | 1,828.03 | 7,811.88 |
| 3800/6 Broadway Alta Crest_____ | 364,280.89 | 179,100.00 | 260,000 | 200,000 | 180,000 | (9,792.11) | (10,038.28) | (3,674.13) |
| 278/284 Tenth Ave_ | 140,971.88 | 90,000.00 | 140,500 | 100,000 | 90,000 | (1,967.65) | (2,287.56) | (944.57) |
| 206/208 East 26th St_____ | 39,959.59 | 18,000.00 | 38,000 | 25,000 | 25,000 | (2,711.47) | (3,370.53) | (719.04) |
| 1175 Sixth Ave____ | 78,518.97 | 47,500.00 | 80,000 | 75,000 | 65,000 | 421.73 | 798.91 | 2,663.24 |
| 204/6 West 13th St. lease_____ | 11,545.00 | ---------- | 48,000 | 15,000 | 40,000 | 1,756.31 | 2,639.77 | 1,939.35 |
| 23 Yonkers lots___ | 57,891.13 | ---------- | 86,550 | 45,000 | 58,000 | (3,648.03) | (6,585.67) | (3,665.82) |
| Total_____ | 1,902,955.62 | 1,195,057.50 | 1,865,050 | 1,455,000 | 1,424,000 | (15,008.30) | (20,589.62) | 4,784.57 |

The petitioner's (1) gross income; (2) net income, without considering any deduction for interest on its 6 per cent 20-year debenture bonds and without considering any net operating loss deduction; and (3) net income, after deducting interest on its 6 per cent 20-year debenture bonds, as shown by its tax returns, but not considering any net operating loss deduction, for the period April 1, 1938, to December 31, 1938, and for the years 1939 to 1953, inclusive, were as follows:

| Year | Gross income | Net income without interest | Net income with interest |
|---|---|---|---|
| 4/1/38–12/31/38 | $180,581.64 | ($588.09) | ($588.09) |
| 1939 | 262,748.88 | 541.01 | 541.01 |
| 1940 | 274,826.40 | 15,926.48 | 6,908.48 |
| 1941 | 257,349.73 | 6,077.49 | (2,604.51) |
| 1942 | 247,420.40 | 2,155.58 | (6,406.42) |
| 1943 | 227,612.55 | (9,998.00) | (18,560.00) |
| 1944 | 236,825.76 | 1,355.21 | (7,206.79) |
| 1945 | 249,525.17 | 22,575.10 | 14,013.10 |
| 1946 | 269,526.44 | 15,973.09 | 7,411.09 |
| 1947 | 287,687.52 | 26,212.42 | 17,650.42 |
| 1948 | 365,028.24 | 105,996.36 | 97,434.36 |
| 1949 | 296,225.48 | 34,144.12 | 18,847,62 |
| 1950 | 296,568.43 | 34,010.52 | 11,978.52 |
| 1951 | 300,326.74 | 31,349.96 | (4,152.04) |
| 1952 | 292,470.43 | 21,623.74 | (408.26) |
| 1953 | 228,195.44 | (34,687.74) | (56,659.74) |

The last column does not reflect deductions for interest on debenture bonds held by Robert L. Hoguet, Marguerite M. Hoguet, and Marie H. Ramee, who were brothers and sisters.

The petitioner paid no dividends during the years 1938 to 1953, inclusive.

Petitioner's debentures were printed on engraved bond paper and City Bank Farmers Trust Company, 22 William Street, New York, New York, is trustee of the indenture under which they were issued and also is registrar for the registration and transfer of such debentures. The debentures were payable as to principal on January 1, 1958, and interest was payable from January 1, 1940, at the fixed rate of 6 per cent per annum, semiannually on January 1 and July 1.

The indenture under which petitioner's debentures were issued defines as acts of default petitioner's failure to pay principal or interest when due, petitioner's failure to observe any of its covenants, the entry of a decree adjudicating petitioner a bankrupt or appointing a receiver for petitioner or for a substantial part of its property, if such decree continues in effect for 60 days, the commencement of an action to foreclose a mortgage upon any property of petitioner which is not dismissed within 60 days, or the filing by petitioner of a voluntary petition in bankruptcy, the making of a general assignment for the benefit of creditors or petitioner's written admission of its inability to pay its debts as they mature. Upon the happening of any event of default the trustee is authorized (and required if it is requested in writing by a majority of the debenture holders) to declare the principal of the debentures to be immediately due and payable. Upon the happening of any event of default or during the continuance thereof the trustee is entitled as of right to request the appointment of a receiver and may proceed to judgment against petitioner if any default in the payment of principal or interest continues for 6 months. The trustee is appointed to act as agent for the debenture holders in the filing of proofs of claim and the institution of any action for the enforcement of the debentures.

Petitioner's debentures had no voting rights, but the entire voting power was vested in the holders of the capital stock of petitioner. Such debentures were transferable separate and apart from the stock of petitioner. They provided that no holder was entitled to sell, pledge, or otherwise dispose of his debentures without first giving 30 days' notice in writing to the other holders setting out the terms of sale, pledge or other disposition and incorporating an offer to sell or pledge his debentures to the other holders under terms and conditions at least as favorable to them as to the proposed purchaser, pledgee, etc. Absent acceptance of such offer within 10 days after the final date set for acceptance, the holder was then free to sell or pledge his debentures under and subject to the same terms and conditions specified in his offer to the other holders. They also provided that such restriction did not apply to transfers for a nominal consideration by gift, deed, trust, or will or to intestacy, nor to any sale or pledge among and between registered holders other than those who had been permitted to acquire debentures by reason of their having been freed from the above-described restrictions upon sale or pledge.

On March 31, 1941, Helen G. Hoguet transferred 10 shares of stock of petitioner to each of the other stockholders. On June 22, 1945, the 210 shares held by Christine Hoguet individually and Christine Hoguet and City Bank Farmers Trust Company, as executors named under the will of Ramsay Hoguet, were transferred to the trustees under the will of Ramsay Hoguet to the extent of 126 shares and 28 shares were transferred to each of the three daughters of Christine Hoguet and the late Ramsay Hoguet. Petitioner's outstanding stock was owned at all times during the taxable years 1950, 1951, 1952, and 1953, as follows:

| Name | Number of shares |
|---|---|
| Robert L. Hoguet | 210 |
| Marguerite M. Hoguet | 210 |
| Rene E. Hoguet | 210 |
| Marie H. Ramee | 210 |
| Helen G. Hoguet | 150 |
| Trustees under the will of Ramsay Hoguet | 126 |
| Christine Hagen | 28 |
| Anne Chase | 28 |
| Louise H. Saurel | 28 |
| Total | 1,200 |

From time to time during the period from October 4, 1939, to December 22, 1949, Helen G. Hoguet sold varying amounts of the $69,000 face amount of petitioner's debentures remaining after the transfer of $31,000 thereof heretofore mentioned, to Marguerite M. Hoguet, Rene E. Hoguet, Robert L. Hoguet, and Christine Hoguet.

On February 13, 1941, petitioner purchased from Helen G. Hoguet at 60, $1,800 face amount of its debentures for a total consideration of $1,080. On April 15, 1941, petitioner purchased from Helen G. Hoguet at 70, $500 face amount of its debentures for a total consideration of $350. Similar purchases at 70 of $500 face amount of such debentures were made by petitioner from Helen G. Hoguet on the 15th day of each of the months from May 1941 to and including December 15, 1941, and on December 31, 1941, petitioner acquired an additional $500 face amount of such debentures at 70. As a result of such acquisitions, petitioner held $6,800 face amount of its debentures on December 31, 1941, for which it had paid a total consideration of $4,580. On March 14, 1942, and on the 15th day of April, May, June, 1942, petitioner acquired from Helen G. Hoguet at 70, $375 face amount of its debentures. On June 15, 1942, petitioner owned an aggregate of $8,300 face amount of such debentures for which it had paid a total of $5,630. On July 1, 1953, petitioner purchased from Helen G. Hoguet at 70, $2,000 face amount of its debentures for a total consideration of $1,400. On January 18, 1957, the estate of Helen G. Hoguet repurchased such $2,000 face amount of debentures from petitioner for a consideration of $1,400. Petitioner made no payment to Helen G. Hoguet with respect to any interest accrued on any of such debentures.

At all times during the calendar years 1950, 1951, 1952, and 1953, $449,000 face amount of the debentures was held as follows:

| | |
|---|---|
| Robert L. Hoguet | $127,000 |
| Marguerite M. Hoguet | 112,100 |
| Rene E. Hoguet | 105,700 |
| Marie H. Ramee | 104,200 |

All of such persons were brothers and sisters, and will hereinafter be referred to as Group No. 1.

At all times during the taxable year 1950, $142,700 face amount of petitioner's debentures were owned as follows:

| | |
|---|---|
| Helen G. Hoguet | $38,200 |
| Trustees under the will of Ramsay Hoguet | 62,100 |
| Christine Hagen | 15,000 |
| Anne Chase | 13,700 |
| Louise H. Saurel | 13,700 |

Christine Hagen, Anne Chase, and Louise H. Saurel were daughters of the late Ramsay Hoguet and Christine Hoguet and were nieces of the persons in Group No. 1. Helen G. Hoguet was a sister-in-law of the persons in that group. The trust created under the will of Ramsay Hoguet was to pay the income to Christine Hoguet during her life and on her death the income was to be paid to Christine Hagen, Anne Chase, and Louise H. Saurel in equal shares with remainder to their descendants per stirpes. None of the persons mentioned in this para-

graph was a partner of the others or of any of the persons in Group No. 1.

In 1951, $1,300 face amount of petitioner's debentures theretofore owned by Christine Hoguet became the property of Anne Chase, Louise H. Saurel, and Christine Hagen and continued to be so owned in 1951, 1952, and 1953; and on June 30, 1953, petitioner acquired $2,000 in face amount of its debentures from Helen G. Hoguet. Except for these transfers, Helen G. Hoguet, Christine Hagen, Anne Chase, Louise H. Saurel, and the trustees under the will of Ramsay Hoguet owned in 1951, 1952, and 1953 the debentures in the face amount of $142,700 that they owned in 1950. The persons mentioned in this paragraph will hereinafter be referred to as Group No. 2.

Petitioner keeps its books and files its income tax returns on an accrual basis and its taxable year is the calendar year.

The period of accrual of interest on petitioner's debentures claimed to be deductible in the taxable years in question, the portion accrued on debentures held by persons in Group No. 1, the date on which such interest was paid, the portion accrued on debentures held by persons in Group No. 2 and the date on which such interest was paid, are as follows:

| Taxable year in which deducted | Period of accrual | Portion accrued on debentures held by persons in Group No. 1 | Date paid | Portion accrued on debentures held by persons in Group No. 2 | Date paid |
|---|---|---|---|---|---|
| 1950 | 1/1-6/30/50 | $13,470 | 1950 | $4,281 | 1950 |
| 1950 | 7/1-12/31/50 | | | 4,281 | |
| 1951 | 1/1-6/30/51 | 13,470 | 1951 | 4,281 | 1951 |
| 1951 | 7/1-12/31/51 | 13,470 | 2/1/52 | 4,281 | 2/1/52 |
| 1952 | 1/1-6/30/52 | | | 4,281 | |
| 1952 | 7/1-12/31/52 | 13,470 | 1/8/53 | 4,281 | 1/8/53 |
| 1953 | 1/1-6/30/53 | | | 4,281 | |
| 1953 | 7/1-12/31/53 | 13,470 | 1/4/54 | 4,221 | 1/4/54 |

At a meeting of the board of directors of petitioner held on March 12, 1940, the chairman pointed out that in view of the other obligations of petitioner it would be impossible to pay the installments of interest falling due on July 1, 1940, and January 1, 1941, and that the debenture holders had been approached for the purpose of securing their agreement to extend each of such installments for 1 year. Such extension was duly agreed to by the debenture holders.

At meetings of the board of directors held on the dates specified below, reports were made as to the income, expenses, and surplus of petitioner, and resolutions were then adopted postponing for the period specified below, subject to the agreement of the holders of 66⅔ per cent of the outstanding debentures, interest accrued thereon to the dates specified below:

| Date of meeting | Due date of interest | Date to which postponed |
|---|---|---|
| 3/11/41 | Jan. 1 and July 1 of 1940 and 1941 | One year. |
| 3/10/42 | Jan. 1 and July 1 of 1940–1942 | 1/1/43. |
| 3/9/43 | Jan. 1 and July 1 of 1940–1943 | 1/1/44. |
| 3/7/44 | Jan. 1 and July 1 of 1940–1944 | 1/1/45. |
| 3/13/45 | Jan. 1 and July 1 of 1940–1945 | 1/1/46. |
| 3/12/46 | Jan. 1 and July 1 of 1940–1946 | 1/1/47. |
| 3/11/47 | Jan. 1 and July 1 of 1940–1947 | 1/1/48. |
| 3/9/48 | Jan. 1 and July 1 of 1940–1947 and 7/1/48 | 10/1/48. |
| 2/23/49 | July 1, 1948, and Jan. 1, 1949 | Not specified. |

At a meeting of the board of directors on November 23, 1949, a resolution was adopted authorizing the payment of one-half of the installment of interest on debentures which became due on July 1, 1949. At a meeting of the board of directors on March 14, 1950, a resolution was adopted providing for the postponement of payment of the remaining one-half of the installment of interest which became due on July 1, 1949, and also the interest becoming due January 1, 1950, provided 66⅔ per cent of the debenture holders agreed. At a meeting of the board of directors held on December 19, 1950, following the reading by the secretary of a letter from the petitioner's accountant showing estimated income of $38,954.27 before interest on debentures, a resolution was adopted authorizing the payment of the installment of interest which became due on July 1, 1950. At a meeting of the board of directors on March 13, 1951, a resolution was adopted authorizing the extension of the installment of interest which became due on January 1, 1951, provided that 66⅔ per cent of the debenture holders approved.

The holders of at least 66⅔ per cent of the outstanding debentures approved the extension of all installments of interest which otherwise would have come due, to and including the installment which became due on January 1, 1951.

At a special meeting of the board of directors of petitioner held on March 7, 1944, it was resolved that an indebtedness of $28,000 to Corn Exchange Bank Trust Company be renewed in the amount of $27,000 and that with the consent of all the holders of petitioner's debentures no part of the principal thereof or interest thereon, current or accrued, be paid to the holders thereof while petitioner was indebted to such bank. Such indebtedness was paid in full prior to the end of 1946.

At the first meeting of the petitioner's board of directors, held on March 30, 1938, the chairman brought to the board's attention that for some time "Hoguet Heirs" had been paying a monthly gratuity of $125 to Ellen M. Atkinson, who was a second cousin of Robert L. Hoguet, Marie H. Ramee, Marguerite M. Hoguet, and Rene E. Hoguet. A resolution was adopted authorizing the payment of this gratuity, commencing with the month of April 1938. Such payments were also authorized by resolutions of the board of directors in each of the years

1939 to 1945, inclusive. At a meeting of the board of directors, held on March 12, 1946, payments to Ellen M. Atkinson during 1945 in the amount of $2,303.01 were approved. At the same meeting the board approved payments made during 1945 for the care of Dr. J. Pierre Hoguet in the amount of $780.53 and further approved subsequent payments to date for the same individual in the amount of $1,630.72 and such additional payments for hospital expenses as might be necessary for him during 1946. Dr. J. Pierre Hoguet was the husband of Helen G. Hoguet and the brother of the persons hereinbefore referred to. Dr. Hoguet had been a surgeon but lost his left hand as a result of an automobile accident in 1931. Thereafter, he was not able to continue his practice and was in need of money from time to time.

At a meeting of the board of directors, held on March 11, 1947, the following payments were approved: $4,027 to Ellen M. Atkinson during 1946 and $3,216 for the care of Dr. J. Pierre Hoguet during 1946.

At a meeting of the board of directors, held on January 5, 1948, payment of $500 for medical and funeral expenses of Ellen M. Atkinson was approved.

The petitioner's bylaws provided for six directors and further provided that a majority of the directors constituted a quorum. The directors named in the certificate of incorporation were the following:

|  | *Relationship* |
|---|---|
| Robert Louis Hoguet (sometimes referred to herein as Robert L. Hoguet) | Brother. |
| Joseph Pierre Hoguet (sometimes referred to herein as J. Pierre Hoguet) | Brother. |
| Rene E. Hoguet | Brother. |
| Marguerite Hoguet | Sister. |
| Marie H. Ramee | Sister. |
| Mark N. Donahue | Attorney for Estate of Ramsay Hoguet, deceased. |

All of the directors, except Mark N. Donahue and Joseph Pierre Hoguet, continued to act as directors through the taxable years here involved.

The terms of office of the other directors were as follows (unless otherwise shown the directors were still acting through the taxable years here involved):

|  |  | *Relationship* |
|---|---|---|
| Mark N. Donahue | 4/1/38–3/14/39 | See above. |
| Joseph Pierre Hoguet | 4/1/38–3/11/47 | See above. |
| Dr. John A. McCreery | 3/14/39–3/13/45 | Brother of Christine Hoguet. |
| Paul Saurel | 3/13/45 | Son-in-law of Christine Hoguet. |
| J. Peter Hoguet, Jr | 3/11/47 | Son of Joseph Pierre Hoguet. |
| Joseph R. Ramee | 3/9/48 | Husband of Marie Ramee. |
| Robert L. Hoguet, Jr | 3/9/48 | Son of Robert L. Hoguet. |

592

The officers of the petitioner elected at the first meeting of the board of directors on March 30, 1938, were the following:

Robert Louis Hoguet_____ President.
Joseph Pierre Hoguet_____ Vice President.
Rene E. Hoguet_____ Treasurer.
Joseph R. Ramee_____ Secretary.

The officers, except Joseph Pierre Hoguet, continued to act through the taxable years. In addition, Joseph R. Ramee was also elected treasurer on March 11, 1947, and thereafter acted as both secretary and treasurer through the taxable years.

The terms of office of the other officers were as follows (unless otherwise indicated, these officers were still acting through the taxable years):

Joseph Pierre Hoguet, Vice Pres., 3/30/38–3/11/47
Rene E. Hoguet, Treasurer, 3/30/38–3/11/47
Rene E. Hoguet, Vice Pres., 3/11/47–3/9/48
Rene E. Hoguet, 1st Vice-Pres., 3/9/48–
Robert L. Hoguet, Jr., 2d Vice Pres., 3/9/48–
Paul Saurel, 3d Vice-Pres., 3/11/52–

Petitioner's income tax return for 1950 was filed on or before June 15, 1951. A tax of $2,755.06 was paid as follows:

Mar. 15, 1951_____ $840.00
June 15, 1951_____ 813.04
Sept. 15, 1951_____ 1,102.02

Petitioner's income tax return for 1951 reported a net operating loss of $4,152.04. The amount deducted on such return as interest included only $22,032 of interest on its debentures, being the sum of the interest accrued during the period January 1 through June 30, 1951, in the amount of $4,281 on the $142,700 face amount of debentures owned by persons in Group No. 2, interest in the amount of $4,281 paid by petitioner on February 1, 1952, accrued during the period July 1, 1951, through December 31, 1951, on the same debentures, and interest paid during the taxable year 1951 in the amount of $13,470 accrued during the period January 1 through June 30, 1951, on the $449,000 face amount of debentures owned by the persons in Group No. 1. On July 28, 1953, petitioner filed a claim for refund of $2,755.06 of income tax alleged to have been overpaid for 1950 on the ground that a deduction should be allowed for 1951 with respect to such $13,470 of interest accrued during the period July 1, 1951, to December 31, 1951, but not paid until February 1, 1952, so that there would be a net operating loss of $17,622.04 for 1951 which should be carried back and allowed as a deduction in computing its taxable net income for 1950.

Oaklawn Corporation was a New York corporation, the outstanding stock of which consisted of 45 shares, each of the par value of $100.

On March 30, 1938, these shares were owned by Hoguet Heirs and had a cost basis of $9,473.71. Petitioner acquired these shares in 1938 as a part of the foregoing transaction with Hoguet Heirs and as a part of the same transaction, an account on the books of Hoguet Heirs, entitled "Advanced to Oaklawn Corporation" was transferred to petitioner.

From the incorporation of Oaklawn Corporation on June 25, 1912, to March 31, 1938, its account with Hoguet Heirs was as follows:

| Years | Advances or repayments received from Hoguet Heirs | Repaid or advanced to Hoguet Heirs | Year-end balances | |
|---|---|---|---|---|
| | | | Receivable from Hoguet Heirs | Payable to Hoguet Heirs |
| 1912 | $38,300.00 | $33,867.38 | | $4,432.62 |
| 1913 | 47,668.04 | 47,455.66 | | 4,645.00 |
| 1914 | 1,077.20 | 2,325.00 | | 3,397.20 |
| 1915 | 2,960.00 | 2,695.00 | | 3,662.20 |
| 1916 | 3,153.09 | 2,250.00 | | 4,565.29 |
| 1917 | 1,425.00 | 1,250.00 | | 4,740.29 |
| 1918 | 1,660.15 | 10,000.00 | $3,599.56 | |
| 1919 | 2,228.37 | | 1,371.19 | |
| 1920 | 2,379.50 | | | 1,008.31 |
| 1921 | 1,055.14 | | | 2,063.45 |
| 1922 | 12,773.74 | 266.75 | | 14,570.44 |
| 1923 | 2,991.58 | 14,783.19 | | 2,778.83 |
| 1924 | 5,869.23 | 8,559.17 | | 88.89 |
| 1925 | 10.00 | 3,917.08 | 3,818.19 | |
| 1926 | 9,000.00 | 18,270.16 | 13,088.35 | |
| 1927 | 9,400.00 | 766.75 | 4,455.10 | |
| 1928 | 239.38 | 264.14 | 4,479.86 | |
| 1929 | | 272.83 | 4,752.69 | |
| 1930 | 118.82 | 285.41 | 4,919.28 | |
| 1931 | | 299.49 | 5,218.77 | |
| 1932 | 10.00 | 317.21 | 5,525.98 | |
| 1933 | 52.24 | 334.09 | 5,807.83 | |
| 1934 | 2,692.72 | 1,613.84 | 4,728.95 | |
| 1935 | 522.21 | 480.84 | 4,687.58 | |
| 1936 | 31,960.62 | | | 27,273.04 |
| 1937 | 3,766.19 | 125.00 | | 30,914.23 |
| 1938 (to March 31) | 1,398.21 | 250.00 | | 32,062.44 |

Interest was charged and taken into account in computing the above year-end balances payable by or to Oaklawn Corporation only to the following extent:

| Year | Interest receivable by Oaklawn Corporation | Interest payable by Oaklawn Corporation | Year | Interest receivable by Oaklawn Corporation | Interest payable by Oaklawn Corporation |
|---|---|---|---|---|---|
| 1921 | | $95.14 | 1930 | $285.41 | |
| 1922 | | 513.39 | 1931 | 299.49 | |
| 1923 | | 251.04 | 1932 | 317.21 | |
| 1924 | | 29.21 | 1933 | 334.09 | |
| 1925 | $117.08 | | 1934 | 353.84 | |
| 1926 | 1,070.16 | | 1935 | 272.07 | |
| 1927 | 766.75 | | | | |
| 1928 | 264.14 | | Total | 4,353.07 | $888.78 |
| 1929 | 272.83 | | | | |

The balance sheet of Oaklawn Corporation, as of March 31, 1938, was as follows:

### ASSETS

| | | |
|---|---:|---:|
| Cash | | $482.46 |
| Land: | | |
| South Broadway, Yonkers, N. Y. | $35,653.97 | |
| 124th Street & First Avenue, N. Y., N. Y. | 66,789.46 | |
| | | 102,443.43 |
| Total assets | | 102,925.89 |

### LIABILITIES AND CAPITAL

| | | |
|---|---:|---:|
| Mortgages payable to others than Hoguet Heirs: | | |
| 2421 and 2427 First Avenue, New York, N. Y. | $21,950.00 | |
| 2423 First Avenue, New York, N. Y. | 10,975.00 | |
| 2425 First Avenue, New York, N. Y. | 10,975.00 | $43,900.00 |
| Unpaid taxes, interest, etc., re land at Yonkers, N. Y. | | 2,545.16 |
| Liabilities to Hoguet Heirs: | | |
| Account payable | 32,062.44 | |
| Mortgage payable, 2419½ First Avenue, N. Y., N. Y. | 18,625.00 | 50,687.44 |
| Total liabilities | | 97,132.60 |
| Capital: | | |
| Capital stock | 4,500.00 | |
| Earned surplus | 1,293.29 | 5,793.29 |
| Total liabilities and capital | | 102,925.89 |

During the period from April 1, 1938, to the date of liquidation of Oaklawn Corporation the open account between petitioner and Oaklawn Corporation was as follows:

| Years | Advances | Repayments | Opening and year-end balances |
|---|---:|---:|---:|
| Balance—Apr. 1, 1938 | | | $32,062.44 |
| 1938 | $1,332.65 | $1,125.00 | 32,270.09 |
| 1939 | 6,186.34 | 2,200.00 | 36,256.43 |
| 1940 | 5,800.00 | 125.00 | 41,931.43 |
| 1941 | 3,180.30 | 250.00 | 44,861.73 |
| 1942 | 700.00 | | 45,561.73 |
| 1943 | 2,303.41 | | 47,865.14 |
| 1944 | 3,790.05 | | 51,655.19 |
| 1945 | 2,950.00 | | 54,605.19 |
| 1946 | 17,075.00 | 6,710.80 | 64,969.39 |
| 1947 | 1,450.00 | | 66,419.39 |
| 1948 | | | 66,419.39 |
| 1949 | 1,055.38 | 13,231.74 | 54,243.03 |
| 1950 | 2,215.27 | 1,800.00 | 54,658.30 |
| 1951 | 1,652.59 | 1,800.00 | 54,510.89 |
| 1952 | 1,711.85 | 1,800.00 | 54,422.74 |
| 1953 | 758.28 | 470.74 | 54,710.28 |

No interest was charged by petitioner on the advances to Oaklawn Corporation.

The advances received by Oaklawn Corporation from petitioner were for the purpose of meeting its operating expenses and taxes.

Oaklawn Corporation sold the property known as South Broadway, Yonkers, in 1946 for $25,000 of which $8,471 was cash and $15,000

was purchase money mortgage. The expenses of sale were $1,529. Oaklawn Corporation applied $6,700 of the cash received in 1946 in reduction of the account payable to petitioner. In 1949 the purchase money mortgage was paid and net cash of $14,000 was received. $12,631.74 of such cash was applied in reduction of the account payable to petitioner. The other payments by Oaklawn Corporation during the period 1938–1953 in reduction of the account payable were made from net rents collected by it.

Oaklawn Corporation's gross and net income (excluding net operating loss deductions) for the years 1938 to 1953, inclusive, were as follows:

| Year | Gross income | Net income | Year | Gross income | Net income |
|------|------|------|------|------|------|
| 1938 | 0 | ($39. 19) | 1946 | ($38, 395. 19) | ($38, 421. 51) |
| 1939 | 0 | (191. 00) | 1947 | 595. 00 | 474. 32 |
| 1940 | 0 | (150. 81) | 1948 | 2, 375. 00 | (694. 96) |
| 1941 | $125. 47 | (197. 12) | 1949 | 2, 139. 10 | (1, 755. 23) |
| 1942 | 0 | (260. 73) | 1950 | 1, 800. 00 | (115. 27) |
| 1943 | 0 | (102. 20) | 1951 | 1, 800. 00 | 147. 41 |
| 1944 | 0 | (39. 39) | 1952 | 1, 800. 00 | 97. 39 |
| 1945 | 0 | (92. 57) | 1953 | (34, 966. 78) | (35, 657. 27) |

The only dividends paid by Oaklawn Corporation were the following:

1926 _____ $9, 000
1927 _____ 8, 775

17, 775

In 1924 Hoguet Heirs sold property known as 2419½–2427 First Avenue, New York City, and received purchase money mortgages of Norving Realty Company as part of the proceeds of sale. Thereafter Hoguet Heirs distributed some of the mortgages to some of its members and retained one mortgage. In 1934 such mortgages were in default and in lieu of foreclosing the mortgages it was arranged that the property be conveyed to Oaklawn Corporation in consideration of its assumption of the outstanding mortgages. As a result of the foregoing 1938 transaction whereby petitioner acquired assets of Hoguet Heirs, petitioner acquired the mortgage which had been owned by Hoguet Heirs. All of the mortgages which Oaklawn Corporation had assumed were first mortgages and none was subordinated to the others. No interest was paid by Oaklawn Corporation on any of such mortgages. In 1953, New York City condemned 2419½–2427 First Avenue and the gross proceeds received by Oaklawn Corporation were $47,500. Expenses were $2,082.25 so that the net proceeds of the condemnation were $45,417.75.

The outstanding mortgages, the property covered thereby and the holders thereof in 1953 were as follows:

| Face amount of mortgage | Property covered thereby | Holder thereof |
|---|---|---|
| $21,650 | 2421 and 2427 First Avenue | Marguerite M. Hoguet. |
| 10,825 | 2423 First Avenue | Christine Hoguet. |
| 10,825 | 2425 First Avenue | Louise L. Hoguet (wife of Robert L Hoguet). |
| 18,625 | 2419½ First Avenue | Petitioner. |

Petitioner's proportionate share of the net proceeds of such condemnation was $13,660.16. The net proceeds of the condemnation were applied to the payment of such mortgages as follows:

| | |
|---|---|
| Marguerite M. Hoguet | $21,650.00 |
| Christine Hoguet | 10,825.00 |
| Louise L. Hoguet | 10,825,00 |
| Petitioner | 2,117.75 |

Immediately after the condemnation of 2419½–2427 First Avenue, the balance sheet of Oaklawn Corporation was as follows:

ASSETS

| | |
|---|---|
| Receivable as net proceeds of sale of land | $45,417.75 |

LIABILITIES AND CAPITAL

Mortgages payable:

| | | |
|---|---|---|
| 2421 and 2427 First Avenue | $21,650.00 | |
| 2423 First Avenue | 10,825.00 | |
| 2425 First Avenue | 10,825.00 | |
| | | $43,300.00 |

Liabilities to Hoguet Real Estate Corporation:

| | | |
|---|---|---|
| Account payable | 54,710.28 | |
| Mortgage payable 2419½ First Ave | 18,625.00 | |
| | | 73,325.28 |
| Total liabilities | | 116,635.28 |

Capital:

| | | |
|---|---|---|
| Capital stock | 4,500.00 | |
| Surplus (deficit) | (75,717.53) | (71,217.53) |
| Total liabilities and capital | | 45,417.75 |

Following the distribution of the proceeds of the condemnation award, Oaklawn Corporation had no property and was dissolved and liquidated.

Petitioner and Oaklawn Corporation filed consolidated income tax returns for the calendar and taxable years 1945 through 1948, inclusive. During such years Oaklawn Corporation had losses aggregating $33,283.16 which were applied to reduce the taxable net income of petitioner reported on such consolidated returns.

Petitioner in computing its net income for 1953 deducted $35,865.67 as being a debt due from Oaklawn Corporation which was worthless. Such amount was computed as follows:

Basis of mortgage receivable due to petitioner from Oaklawn Corporation_____ $18,625.00
Less amount available for distribution to petitioner on account of such mortgage_____ 13,660.16

Unpaid balance of mortgage_____ $4,964.84
Open account advances receivable by petitioner from Oaklawn Corporation_____ 54,710.28

Total_____ 59,675.12
Total losses of Oaklawn Corporation allowed as deductions against petitioner's income on consolidated returns_____ 33,283.16
Portion applied to reduce basis of stock of Oaklawn Corporation_____ 9,473.71

Balance applied in reduction_____ 23,809.45

Amount claimed as deductible bad debt_____ 35,865.67

Petitioner's net income for 1953, computed without any deduction for the $35,865.67 claimed as a bad debt and without any deduction for the $21,972 deducted as interest on its debentures was $1,177.93.

None of the exceptions, additions, and limitations referred to in subsections (a), (b), and (c) of section 122 of the Internal Revenue Code of 1939 was applicable in the calculation of petitioner's loss of $56,659.74 for 1953.

Petitioner was not entitled to any credits under section 26 (h) and (i) of the Internal Revenue Code of 1939.

In computing petitioner's net income for 1952, no deduction has been taken or allowed for a net operating loss deduction claimed by petitioner to be allowable in such year by reason of a net operating loss carryback from the taxable year 1953.

The balance sheets included in petitioner's income tax returns for the years 1950 to 1953, inclusive, disclose the following amounts in its accrued interest liability account and in its surplus account on December 31 of each of those years:

| Year | Accrued interest | Surplus (deficit) |
| --- | --- | --- |
| 1950 | $370,327.06 | ($182,480.33) |
| 1951 | 388,714.38 | (199,233.52) |
| 1952 | 405,974.37 | (257,382.02) |
| 1953 | 422,009.08 | (375,969.17) |

The debentures issued by the petitioner did not represent a bona fide indebtedness, but did in fact represent equity capital.

The advances made to Oaklawn Corporation were capital contributions to that corporation and not loans.

598

RAUM, *Judge:* 1. The principal issue relates to the correctness of the Commissioner's disallowance of interest deductions with respect to petitioner's so-called debentures. The only question in controversy is whether these debentures in fact represented an indebtedness. If they did not, as contended by the Commissioner, the deductions were properly disallowed. The solution to the problem depends, as recognized by petitioner, upon a consideration of all the relevant facts and circumstances. And we have found, after an exhaustive study of the record, that the so-called debentures were not intended to be nor were they in fact a genuine indebtedness.

The petitioner was incorporated in 1938 to acquire property owned by a joint venture composed of the six Hoguet heirs, persons closely related to each other by blood or marriage. Petitioner's formal structure consisted of 1,200 shares of stock and $600,000 in the controverted debentures, which had been issued originally in equal amounts to the six heirs. At the time of the transfer the book value of the assets was $788,921.63 which included a net book value in real estate in the amount of $707,898.12. But the net book value of that real estate was grossly in excess of the actual net equity in that property, which, according to our findings, was $228,942.50, being the difference between its fair market value of $1,424,000 and outstanding mortgages totaling $1,195,057.50. Thus the $600,000 face amount of the debentures alone was approximately $300,000 in excess of the fair market value of all the property received by petitioner. In view of these facts, this is not a case of "thin capitalization," it is in fact a case of no capitalization.

That the debentures may have had the formal attributes of indebtedness is not conclusive, if it is in fact plain that the assets contributed to the corporation in exchange therefor were intended to be subject to the risk of the enterprise and that there was not a genuine intention to pay the interest and principal called for by the terms of the instrument.

The petitioner never paid any dividends. Its annual income, without considering bond "interest," never approached its annual "obligation" to pay "interest" of approximately $35,500 until 1948, and, except for that year, was less in all subsequent years. The payment of the first two installments of "interest" due on July 1, 1940, and January 1, 1941, was postponed by action of its board of directors on March 12, 1940, after the chairman stated that "in view of the other obligations of the corporation" it would be impossible to pay them. Thereafter, the payment of all later installments due through January 1, 1949, was postponed by resolutions of the directors at annual meetings where a reading of the petitioner's income state-

ments preceded the resolutions. Except for one-half of the "interest" installments due on July 1, 1949, the payment of all later installments was similarly postponed until December 19, 1950, when following the reading of a report from petitioner's accountant, announcing an estimated income of $38,954.27, it was resolved by the directors to pay the "interest" installments due July 1, 1950. The installment of January 1, 1951, was postponed at a directors' meeting on March 13, 1951.

Thus, although the bonds provided for the payment of "interest" semiannually, the directors of petitioner, all of whom were Hoguet heirs or members of their families, repeatedly postponed such payment with the consent of the bondholder-stockholders, who were Hoguet heirs. Payment was in fact postponed for more than 10 years, and then only one-half of one installment was paid following a report that earnings were sufficient to permit this payment. Thus, the provision for the payment of "interest" semiannually was treated by petitioner's board of directors as one which obligated them to make payments when and only when it had sufficient earnings from which the "interest" could be paid. "This is not a characteristic of an interest obligation but is characteristic of the duty to pay dividends." *Wetterau Grocer Co.* v. *Commissioner*, 179 F. 2d 158, 160 (C. A. 8). All of the relevant facts and circumstances, including those mentioned above, convince us that the debentures did not in reality evidence a genuine indebtedness, and that the substance of the transaction, at the time it was consummated in 1938, was an exchange by the Hoguet heirs of their respective interests in a joint venture for similar proprietary interests in their wholly owned corporation, the petitioner. We hold, therefore, that the respondent did not err in determining that the debentures did not represent an indebtedness and in disallowing the deductions for interest claimed by petitioner in its returns for the years 1950 to 1953, inclusive. Cf. *1432 Broadway Corporation*, 4 T. C. 1158, affirmed per curiam 160 F. 2d 885 (C. A. 2) ; *Isidor Dobkin*, 15 T. C. 31, 33, affirmed per curiam 192 F. 2d 392 (C. A. 2) ; *Sam Schnitzer*, 13 T. C. 43, 62, affirmed per curiam 183 F. 2d 70 (C. A. 9), certiorari denied 340 U. S. 911; *Root* v. *Commissioner*, 220 F. 2d 240, 241 (C. A. 9).

The fact that the proportionate holdings of stock and debentures was disturbed by transactions among the heirs or between them and the petitioner is not a matter of consequence in the light of the present record. All the security holders were members of the same family, closely related by blood or marriage. Indeed, petitioner was used to discharge certain family moral obligations such as looking after a second cousin and taking care of the needs of a brother whose medical career as a surgeon had unfortunately been cut short as the result of an accident. To the extent that there were disproportionate holdings

the matter is of considerably less significance than might otherwise be the case among strangers where arm's-length dealings are more likely to be encountered and where disproportionate holdings might be more meaningful. The parties apparently were content to permit voting control to continue in accordance with the distribution of stock while letting the debentures represent their true economic fractional interests in the enterprise. The debentures were their real capital investments and did not constitute genuine debts which could give rise to deductible interest.

2. As a result of the disallowance of the interest deduction claimed by petitioner for 1952, it had net income for that year in the amount of $21,623.74. Petitioner's alternative contention is that it had a net operating loss for 1953 which it is entitled to carry back and apply as an offset against its 1952 net income. In its 1953 return, it reported a net loss of $56,659.74. In computing the amount of this net loss, it deducted $21,972 as interest on its debentures and $35,865.67 as a bad debt. Since, as we have held, it is not entitled to the interest deduction, its right to a net operating loss carryback depends upon the bad debt item.

The bad debt of $35,865.67 was based upon two losses which petitioner claims it sustained in 1953, when the Oaklawn Corporation was liquidated. One, in the amount of $4,964.84, represents the unpaid balance of the mortgage held by petitioner on the First Avenue property. The other, in the amount of $54,710.28, represents the balance shown in the open account between petitioner and Oaklawn Corporation. The total of these two amounts was reduced by $23,-809.45, the portion disallowed by Regulations 129, section 24.37 (b), in arriving at the claimed deduction of $35,865.67. The disallowance of all of the claimed deduction would result in petitioner having net income of $1,177.93 for 1953.

Respondent concedes that the amount of $4,964.84 is deductible as a loss and that petitioner had a net loss of $3,786.91 in 1953 which is allowable as a net operating loss carryback to 1952. There remains for determination, therefore, only the question whether the balance of $54,710.28 shown in the open account constituted a debt which became worthless in 1953. The burden of proving that it did rests on the petitioner.

On brief petitioner states that in view of the long history of the open account between Oaklawn and its stockholders, showing advances and repayments by both parties, the parties intended the moneys going into Oaklawn to be advances rather than capital contributions. We do not agree. There is in evidence a statement of an account covering the period June 25, 1912, to March 31, 1938, when the Hoguet heirs owned all of the stock of Oaklawn, showing yearly payments by the heirs to their wholly owned corporation and by it to the heirs,

which resulted in year-end balances in favor of the heirs in some years and in favor of the corporation in others. During the years 1921 to 1935, inclusive, interest at an undisclosed rate was taken into account in computing the year-end balances. These balances were in favor of Oaklawn at the end of the years 1925 to 1935, inclusive. The Hoguet heirs made "advances" to Oaklawn of $31,960.62 in 1936, $3,766.19 in 1937, and $1,398.21 during the period January 1 to March 31, 1938. As a result of these "advances" there were substantial balances in the open account in favor of the heirs at the end of the years 1936 and 1937, and the balance as of March 31, 1938, amounted to $32,062.44. When petitioner acquired the stock of Oaklawn on the latter date, it entered the $32,062.44 on its books as an account receivable from Oaklawn from the Hoguet heirs.

In 1934 the Hoguet heirs conveyed the First Avenue property to Oaklawn in consideration of its assumption of the payment of four mortgages on the property, one of which was then held by the heirs. While the evidence does not disclose the income realized or loss sustained by Oaklawn from its operations in the years prior to March 31, 1938, it is quite apparent from the record of amounts contributed to it by its stockholders and amounts returned by it to them, that in 1934 and subsequent years its income-producing properties did not provide sufficient income to enable it to meet its operating and other expenses. When petitioner acquired its stock on March 31, 1938, its assets consisted of cash in the amount of $482.46, the lots on South Broadway, and the First Avenue property. During the years 1938 to 1953, petitioner made "advances" to enable Oaklawn to meet its operating expenses and taxes in the total amount of $52,162.12. During 9 of these 16 years Oaklawn realized no gross income and its gross income for the other 7 years ranged from $125.47 to $2,375. In 10 of the 16 years it made so-called repayments totaling $29,513.28. They were made from net rents collected, except in 1946 and 1949, when cash proceeds from the sale of its South Broadway lots in the amounts of $6,700 and $12,631.74 were distributed to petitioner. No dividends were paid by Oaklawn during the years petitioner held its stock. No interest was charged by petitioner on its "advances," and it received no notes or other evidence of indebtedness from Oaklawn.

After a careful consideration of all of the evidence, we have reached the conclusion that petitioner has not sustained its burden of proving that the balance of $54,710.28, shown in the Oaklawn account when that corporation was liquidated in 1953, represented a debt which became worthless in that year. There is no convincing proof that Oaklawn's stockholders, who made the contributions which resulted in this balance, ever expected repayment, or had reasonable grounds for believing that Oaklawn would ever be in a position to make repayment. The balance represented funds which the stockholders of Oak-

lawn had voluntarily contributed over a period of approximately 20 years to enable it to meet its operating expenses after the heavily mortgaged First Avenue property was transferred to it by the Hoguet heirs. These contributions were in the nature of capital contributions. Capital contributions cannot be deducted as worthless debts. Cf. *American Cigar Co.* v. *Commissioner*, 66 F. 2d 425 (C. A. 2) certiorari denied 290 U. S. 699. The respondent did not err in his determination that the petitioner is not entitled to deduct any portion of the $54,710.28 balance as a bad debt in computing the amount of its net operating loss for 1953.

*Decision will be entered under Rule 50.*