Zephyr Mills, Inc. v. Commissioner.
Zephyr Mills, Inc. v. Commissioner
Docket No. 65923.
United States Tax Court
T.C. Memo 1959-181; 1959 Tax Ct. Memo LEXIS 67; 18 T.C.M. (CCH) 794; T.C.M. (RIA) 59181; September 28, 1959
Joseph J. Brown, Esq., 1535 Land Title Building, Philadelphia, Pa., for the petitioner. Albert Squire, Esq., for the respondent. TIETJENS
Memorandum Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax for the taxable years ended June 30, 1953, and June 30, 1954, in the respective amounts of $2,144.36 and $5,404.57. The only question for decision is whether the amounts of $26,262.36, $26,490, $16,578, $30,894, and $15,456 were properly claimed as deductions for interest in the fiscal years ending June 30, in 1948, 1949, 1950, 1951, and 1952. The decision of this question will determine whether or not there is a net operating loss carry-over to the fiscal years ending in 1953 and 1954. All of the facts are stipulated, are so found, and the stipulation *68 together with the exhibits attached thereto are included herein by reference. Petitioner is a corporation organized July 19, 1939 under the laws of Pennsylvania. Its principal office and place of business are located in Weissport, Pennsylvania. Its income tax returns for the years ended June 30, 1948 to June 30, 1954, inclusive, were filed with the district director (formerly collector) of internal revenue at Philadelphia, Pennsylvania. Petitioner's outstanding capital stock never has exceeded $500. It is authorized to issue 100 shares of no par value stock. Upon incorporation it issued the 100 shares for $5 per share. Helen H. Smith purchased 75 shares and Edwin J. Doerr purchased 25 shares. Helen still owns her 75 shares. Doerr surrendered his shares to the petitioner in May 1945 for cancellation, receiving $2,125 therefor. No other changes have occurred in the number of shares outstanding. Petitioner is authorized to manufacture, sell and deal in hosiery, knit goods and all kinds of textiles. In July 1939 it took over the hosiery business of Edwin J. Doerr, who was trading as Lehigh Hosiery Service. Lehigh Hosiery Service did no manufacturing of its own, but contracted out *69 its manufacturing. Lehigh Hosiery Service had been organized late in 1938 or early in 1939. Its financing came from two principal sources: (1) All of its raw silk was purchased on credit from Northumberland Corporation; and (2) loans, as follows: Lender
Amount of Loan
Helen H. Smith
$ 5,000
Donald V. Smith
20,000
William F. Hofford
15,000
$40,000 Donald V. Smith was the husband of Helen H. Smith; William F. Hofford was the father of Helen H. Smith. From its organization in 1939 until 1942, petitioner contracted out its manufacturing. From 1942 until 1953, however, petitioner itself engaged in sewing and manufacturing of full fashion hosiery and cotton tee shirts. On July 25, 1939, petitioner entered into an agreement with Northumberland Corporation for the credit purchase of all of its raw silk requirements. Under this agreement petitioner became bound: (1) not to enter into any contracts or agreements (with certain exceptions) without the written consent of Northumberland Corporation; (2) to permit Northumberland to countersign all of its checks, promissory notes and other commercial paper; (3) to furnish Northumberland with a monthly financial statement; *70 and (4) to allow Northumberland to inspect its books at all reasonable times. On May 28, 1941, petitioner was indebted to Northumberland Corporation for $43,794.94. On that day, petitioner, Northumberland, and Commercial Factors Corporation entered into an agreement providing: (1) Petitioner would pledge to Northumberland as collateral security all of its merchandise then existing or to be manufactured; (2) Northumberland could choose the dyeing and finishing plants to which petitioner's merchandise could be sent; (3) Northumberland would contract with Commercial Factors Corporation for the factoring of petitioner's sales; and (4) Northumberland could pledge petitioner's merchandise to the factor. On October 15, 1941, petitioner's agreements with Northumberland Corporation and Commercial Factors Corporation were terminated. On that day, petitioner entered into a factoring agreement with MGM Factors Corp., containing the following chief provisions: (1) The factor received possession of petitioner's place or places of business; (2) and of petitioner's merchandise, then existing or to come into existence, and all such merchandise was to be consigned to the factor; and (3) the factor *71 received the right to approve all of petitioner's sales. Petitioner's operations under its agreements with MGM Factors Corp. continued until 1945. The financing charges paid by petitioner to MGM Factors Corp. during this period amounted to approximately 20 per cent per annum on all advances made by that company. Donald V. Smith was the president and chief executive officer of petitioner from its incorporation in 1939 until his death on October 6, 1952. During this entire time he was also a director, and from December 12, 1947 until his death he was treasurer of petitioner. In July 1943 Donald V. Smith became sole trustee of five separate but similar trusts, known as the Hofford trusts, with full power and discretion to invest their assets without being liable for any loss or depreciation which might occur. The trusts had been formed in 1937 by William F. Hofford, Donald's father-in-law, who died in September 1940. One of the trusts was for the benefit of Hofford's daughter, Helen H. Smith; each of the other four trusts was for the separate benefit of each of Donald's and Helen's four children. Each of the trusts contained, inter alia, the following provisions: "Trustees and their *72 successors shall have full power, authority and discretion: "(a) To sell or otherwise dispose of the assets at any time comprising this trust. "(b) To invest, reinvest, alter and change the assets at any time comprising the trust estate in or to investments, including corporate stock, without being confined to what are known as 'legal investments' and without liability for any loss or depreciation which may occur." On January 2, 1945, Donald V. Smith, as president of petitioner, entered into the following agreement with Donald V. Smith, as trustee of the Hofford trusts: "AGREEMENT, made this Second day of January 1945, between ZEPHYR MILLS, INC., a Pennsylvania corporation, hereinafter called 'Zephyr', and DONALD V. SMITH, TRUSTEE, hereinafter called 'Smith'. "WHEREIN IT IS MUTUALLY AGREED AS FOLLOWS: "1. Smith agrees to lend to Zephyr all moneys required by it in the regular conduct of its business; provided, however, that the amount of said loans at any one time outstanding may, at the discretion of Smith, be limited to Fifty Thousand ($50,000.00) Dollars. "2. Zephyr agrees that, if so requested by Smith, it will pledge and assign its accounts receivable, stock, inventories, *73 merchandise and machinery as collateral security for any and all indebtedness then or thereafter owing by it to Smith, such pledge and assignment to be made in the manner and form directed by Smith. "3. Zephyr agrees to pay Smith interest at the rate of twelve (12%) per cent per annum on all amounts loaned to it by Smith under this agreement. Such interest shall be computed as of the close of each month and paid on or before the fifteenth day of the succeeding month. "4. This agreement may be terminated at any time by either party upon ninety (90) days' written notice. Upon such termination all indebtedness owing by Zephyr to Smith shall immediately become due and payable." Pursuant to the agreement of January 2, 1945, petitioner received substantial sums from Donald V. Smith, as trustee of the Hofford trusts. Petitioner recorded these receipts as credits in a ledger account entitled, "Donald V. Smith, Trustee", which account discloses the following entries: Debits
Date
Amount
March 3, 1945
$ 37.58
August 30, 1947
7,500.00
April 3, 1948
25,000.00
June 26, 1948
5,000.00
July 31, 1948
12,000.00
August 28, 1948
9,500.00
January 27, 1950
40,900.00
$ 99,937.58
Credits
October 28, 1944
$ 5,000.00
March 3, 1945
45,837.58
March 31, 1945
10,200.00
April 28, 1945
15,000.00
September 29, 1945
10,000.00
November 3, 1945
10,000.00
April 10, 1946
14,000.00
September 28, 1946
20,000.00
October 9, 1946
15,000.00
November 30, 1946
10,000.00
February 1, 1947
50,000.00
May 31, 1947
10,000.00
August 30, 1947
5,000.00
December 31, 1947
12,500.00
January 31, 1948
25,000.00
April 3, 1948
25,000.00
May 29, 1948
10,000.00
July 31, 1948
33,000.00
October 2, 1948
7,500.00
December 31, 1948
21,000.00
December 31, 1949
3,500.00
$357,537.58
Balance, January 27, 1950
$257,600.00
*74 All of the credit entries posted to this account were from the cash receipts journal, excepting only the credit of $45,837.58 of March 3, 1945, which was transferred from two accounts: $16,587.58 from Loans Payable account, and $29,250 from Notes Payable account. All of the debit entries posted to this account were from the cash disbursements journal, excepting only the debit of $40,900 of January 27, 1950, which was an adjusting entry posted from the General Journal. The explanation accompanying this entry read as follows: "To adjust trustee Acct. in accordance with trustee book. Difference is money invested by D.V.S. on a personal basis and is now being transferred to its proper Acct. "D.V.S. Trustee
$40,900.00
Advances
48,600.00
"D.V.S. Personal
$89,500.00"
The ledger account showed a credit balance of $257,600 as of January 27, 1950. There were no further entries in this account between January 27, 1950 and June 17, 1957. Petitioner received no further advances from the Hofford trusts after December 31, 1949. On January 27, 1950, petitioner issued its demand promissory note for $257,600 payable with interest to Donald V. Smith, Trustee. No interest *75 rate was stated in the note. Some earlier notes had been issued by petitioner to evidence some of the advances it had received from the Hofford trusts. Donald V. Smith died on October 6, 1952. Helen H. Smith succeeded him as sole trustee of the Hofford trusts. Samuel E. Smith, Donald's son, succeeded him as president of petitioner. On May 13, 1953, Helen H. Smith, as trustee of the Hofford trusts, and Samuel E. Smith, as president of petitioner and related corporations, entered into an agreement with The First National Bank of Philadelphia. The agreement was evidenced by a letter signed by Helen and Samuel and addressed to the bank, the body of which reads as follows: "In consideration of the loan to be made by The First National Bank of Philadelphia to Ellisville Hosiery Mills, Inc., Zephyr Mills, Inc. and W. F. Hofford, Inc., in the total amount of $50,000.00, the undersigned agree that so long as any of the present or future indebtedness of said Companies to The First National Bank of Philadelphia remains unpaid, said Companies shall make no payment on account of either principal or interest against any of the indebtedness represented by loans heretofore made to them by Donald *76 V. Smith, as trustee." The foregoing agreement remained in effect until April 1957, when the balance owing to said bank by petitioner and its affiliated companies was paid in full and petitioner's financial relations with said bank were terminated. During April 1957 upon the termination of petitioner's financial arrangement with The First National Bank of Philadelphia and in order to obtain continued bank credit required by petitioner and its affiliated companies for their business operations, it was necessary for them and for Helen H. Smith, as trustee of the Hofford trusts, to enter into an agreement with The First National Bank and Trust Company of Bethlehem. This agreement was evidenced by a letter signed by Helen and addressed to the bank, the body of which reads as follows: "W. F. Hofford, Inc., Ellisville Hosiery Mills, Inc., Zephyr Mills, Inc., Weissport Dye Works, Inc. and Manufacturers Oils, Inc. are presently indebted to me as trustee of the four trusts dated December 28, 1937, created by William F. Hofford for the primary benefit of Helen Hofford Smith, Donald V. Smith, Jr., Samuel E. Smith and Jo Ann R. Smith, as the respective life beneficiaries thereunder, said *77 indebtedness amounting to the total sum of $352,000.00. "In consideration of loans to be made to said corporations, from time to time, by your Company, at its discretion, and as an inducement for its making such loans, I, as trustee of each of the aforesaid trusts, hereby agree to subordinate the aforesaid indebtedness of said corporations to me, as such trustee, to the payment of any and all indebtedness of said corporations, or any of them, to your Company with respect to its aforesaid loans; provided, however, that the foregoing subordination shall not preclude the payment of interest to me as said trustee not in excess of six per cent per annum, upon the aforesaid indebtedness of $352,000.00. "The letter of agreement was endorsed as follows: "The undersigned hereby approve of the attached subordination agreement executed by Helen Hofford Smith, as trustees of the four trusts to which said agreement refers, and agree to abide by the terms thereof. "HELEN HOFFORD SMITH DONALD V. SMITH, JR. SAMUEL E. SMITH JO ANN R. SMITH." No payments were made by petitioner to reduce the $257,600 principal balance during the seven year period, 1950 to 1956, inclusive. The following payments, *78 however, were made thereon by petitioner in 1957 and 1958: Date
Amount
Payee
June 17, 1957
$38,000.00
Helen Smith Saddy
June 21, 1957
600.00
Samuel Frederick,
Attorney
June 21, 1958
320.00
Samuel Frederick,
Attorney
May 29, 1958
758.00
Claude T. Reno, At-
torney
$39,678.00
Helen Smith Saddy was the life beneficiary of one of the five Hofford trusts. She did not sign the foregoing April 1957 agreement with The First National Bank and Trust Company of Bethlehem, nor did Helen H. Smith, the trustee, represent her trust in that agreement. The foregoing payment to Helen Smith Saddy represented the amount of accumulated and unpaid income as of December 31, 1951, owing to her by her Hofford trust as life beneficiary. The remaining payments were for legal services rendered upon behalf of Helen H. Smith, trustee. Petitioner made payments to Donald V. Smith, trustee, with respect to the sums he had advanced petitioner, in the following amounts: Taxable Year
Ended
Amount Deducted
June 30, 1948
$26,262.36
June 30, 1949
26,940.00
June 30, 1950
16,578.00
June 30, 1951
30,894.00
June 30, 1952
15,456.00
June 30, 1953
None
June 30, 1954
None
*79 These payments were treated as interest on petitioner's books and deducted as interest on petitioner's returns. These amounts are equivalent to 12 per cent per annum until April 1, 1949, 6 per cent per annum from April 1, 1949 to June 30, 1950, and 12 per cent per annum from July 1, 1950 to December 31, 1951. No such payments have been made for any period subsequent to December 31, 1951. Donald V. Smith, trustee, agreed to a reduction of such payments to 6 per cent per annum, for the period April 1, 1949 to June 30, 1950, inclusive, because of existing business conditions. Donald V. Smith, trustee, reported all payments he received from the petitioner on the sums he had advanced, as interest income on the trusts' income tax returns. The income taxes applicable thereto have been paid. Petitioner filed its income tax returns on an accrual basis. However, it did not deduct interest for periods for which it made no payments to the trustee, and the deductions which it took as interest did not exceed the amounts actually paid. The condensed balance sheets of petitioner as reported in its tax returns for the taxable years June 30, 1947 to June 30, 1955, show the following "Total *80 liabilities less net deficit or plus net worth": 1947
$254,593.57
1948
381,284.32
1949
330,144.19
1950
332,597.52
1951
289,975.45
1952
291,018.69
1953
292,312.63
1954
277,007.19
1955
255,844.74
On each date for which a condensed balance sheet is shown, petitioner's liabilities exceeded its assets, excepting only June 30, 1954, when assets exceeded liabilities by $235.25. In the above condensed balance sheets, current assets consist of cash, notes and accounts receivable and inventories; capital assets consist almost entirely of full fashion hosiery and sewing machines less reserves for depreciation; and included in miscellaneous assets is treasury stock of $2,125. Current liabilities consist of accounts payable, notes payable with original maturity of less than one year, and accrued taxes, payroll and other expenses. Long-term liabilities include the amounts owing to the Hofford trusts. The condensed income statements of petitioner as reported in its tax returns for the taxable years ended June 30, 1948 to June 30, 1955, inclusive, show net income or loss before net operating loss deductions as follows: 1948
$ 74.97
1949
(72,832.99)
1950
49,180.30
1951
34,123.13
1952
(43,148.17)
1953
30,964.28
1954
18,015.22
1955
(23,816.40)
*81 The advances made to petitioner and the purported notes issued from time to time in connection therewith did not represent a bona fide indebtedness, but in fact were contributions of equity capital. The primary inquiry here is whether the amounts deducted as set forth in the preliminary portion of this opinion were "interest" and so properly deductible as such under section 23(b), Internal Revenuecode of 1939 which allows a deduction for "All interest paid or accrued within the taxable year on indebtedness". Petitioner cites no cases in support of its contention that the deductions in question were for "interest paid", but relies upon what it conceives to be the crucial test - i.e., "whether the parties to the transaction intend to create a genuine indebtedness, or whether the formalities adopted represent mere sham intended to disguise what is in reality a capital contribution. Any uncertainty involving the application of the foregoing test in a particular case, arises from the varying importance ascribed to evidence regarded as indicative of intention." We do not have too much quarrel with this argument, but the burden is on petitioner to show error in the Commissioner's *82 determination disallowing the claimed amounts "since they do not represent interest expense applicable to valid indebtedness". As stated in a comparatively recent opinion of this Court, the answer to this question depends "upon a consideration of all the relevant facts and circumstances." Hoguet Real Estate Corporation, 30 T.C. 580, 598. We have found as a fact that the so-called indebtedness did not represent a bona fide indebtedness. This finding was not based on any particular fact or circumstance, but upon our careful consideration of the entire record. The facts - all of which have been stipulated - are adequately recited above and no useful purpose would be served by a rehash here. We will, however, refer to the salient points which led us to the conclusion that the advances to petitioner made by the trustee of the Hofford trusts was not a bona fide indebtedness. Petitioner began business with a modicum of risk capital - 100 shares at $5 a share - of which 25 shares were cancelled in 1945 for $2,125. This capitalization remained unchanged over the years in question. Petitioner's early financing, when its business was primarily that of a selling organization, *83 was handled through factors who charged approximately 20 per cent on advances and, in practical effect, assumed control of petitioner's operations and merchandise. As petitioner's business grew to include some aspects of manufacture it terminated its factoring connections and entered into the agreement heretofore set out with Donald V. Smith, trustee of the Hofford trusts. This agreement, true enough, referred to the arrangement as one "to lend," provided for the payment of "interest" at 12 per cent per annum and the balance of the amounts advanced was translated on January 27, 1950, into a demand note for $257,600 and the parties referred in their income tax returns and other documents to the payments made as "interest". Neverthless, we are entitled to look beyond the forms and terms employed by the parties, especially where the transactions were carried on between related and interested persons. Hoguet Real Estate Corporation, supra. Here, Helen H. Smith was petitioner's sole stockholder. Her husband was president, director and sometimes treasurer of petitioner. He was also the so-called lender, as trustee of trusts for the benefit of Helen and their children. He *84 presumably was thoroughly familiar with petitioner's business and its financial needs and directed its operations until his death. The record shows petitioner had no earned surplus either on June 30, 1947, or on any material date thereafter. It did have machinery costing more than $100,000 during the taxable years ended June 30, 1948 to June 30, 1952, inclusive, and its annual cost of goods sold during those years approached one million dollars. So far as the record shows, no dividends were ever paid on Helen's stock. In almost every year material hereto petitioner's balance sheets showed a net deficit. The need of petitioner for equity capital over the years is abundantly clear from this record. When petitioner cut loose from its factor at the beginning of 1945 it owed the factor some $40,000. Over the succeeding years petitioner, for use in its operations (though the record does not show the exact uses to which the funds were put) received over $350,000 from its chief executive officer, the husband of the sole stockholder, from funds which he held in trust for his wife (the sole stockholder) and their children and which he was empowered to invest "without liability". Though the *85 advances were ostensibly repayable on demand, no payments were made by petitioner to reduce the balance of $257,600 during the seven-year period 1950 to 1956, inclusive, and no demand was made for repayment. It is also to be noted that the so-called interest payable thereon was reduced or not collected, depending on business conditions, and the balance outstanding was subordinated to bank loans when the need for "outside" funds arose. Further, though permitted by the agreement, Donald never required the advances to be collateralized. While we hestitate to use the term "thin capitalization" in deciding this case, we do so because it gives us an opportunity to quote Judge Raum's apt observation in Hoguet Real Estate Corporation, supra, that "this is not a case of 'thin capitalization', it is in fact a case of no capitalization." Petitioner makes much of the fact that Donald was not a stockholder of petitioner either individually or as trustee of the Hofford trusts. However, in view of his positions as president, director and sometime treasurer, of petitioner and the fact that the sole stockholder was his wife and that she and their children were the sole beneficiaries *86 of the Hofford trusts we are unwilling to let this aspect of the case assume controlling importance. We also point out that as a matter of fact, Donald was succeeded by Helen as trustee on his death in 1952 and his son, Samuel, beneficiary of one of the trusts, then became president of petitioner. On the facts, we think the "substantial economic reality" of this case is that the advances constituted risk capital and not debts. See Gilbert v. Commissioner, (C.A. 2) 262 F. 2d 512, affirming a Memorandum Opinion of this Court [17 TCM 29; T.C. Memo. 1958-8]. The question to be decided, whether the advances to petitioner are contributions to capital or loans, is, after all, essentially a question of fact upon which the taxpayer has the burden of establishing his right. Gilbert v. Commissioner, supra. All of the relevant facts and circumstances, including those mentioned above, convince us that the payments here sought to be deducted were not "interest" paid on a bona fide "indebtedness" and we approve the Commissioner's determination. Decision will be entered for the respondent.