# 580

JACOB M. KAPLAN AND ALICE M. KAPLAN, PETITIONERS, *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1156–62.   Filed February 5, 1965.

*Simon H. Rifkind* and *Alan N. Cohen,* for the petitioners.
*Robert A. Trevisani,* for the respondent.

PIERCE, *Judge:* The Commissioner determined deficiencies in the income taxes of the petitioners for their taxable calendar years 1952 and 1953, in the amounts of $862,429.85 and $64,940.08, respectively; and he also determined that petitioners are liable for an addition to tax for the year 1952 in the amount of $52,200.50, for substantial underestimation of estimated income tax for said year.

The basic issue to be decided is: Whether the amounts of $968,000 and $116,000 which petitioner Jacob M. Kaplan received in 1952 and 1953 in the form of non-interest-bearing open account advances from Jemkap, Inc. (a wholly owned subsidiary of Navajo Corp. of which said petitioner was the sole stockholder), constituted, in substance and reality, distributions from the parent Navajo Corp. with respect to its stock, which are taxable as dividends to said petitioner to the extent of the latter corporation's earnings and profits.[1]

Two other issues—each of which is wholly dependent on the outcome of the above-stated basic issue—are: (1) Whether the petitioners are liable for an addition to tax for substantial underestimation of

---

[1] Alternative claims presented by respondent in the pleadings—that said advances were dividends either from Jemkap, Inc. (without regard to its being a subsidiary of Navajo), or from another wholly owned subsidiary of Navajo named Eastmanton Corp.—have not been pressed by respondent in his briefs.

their estimated income tax for the year 1952; and (2) whether petitioners are entitled to a medical expense deduction for the year 1953, after consideration is given solely to the statutory limitation on medical deductions as applied to the petitioners' correct adjusted gross income for said year.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference, subject, however, to an understanding that descriptive words used in said stipulation, such as "indebtedness," "debt," "loan," and other words of this general class, are not conclusive as to the true character of the transactions to which they relate.

The petitioners, Jacob M. Kaplan and Alice M. Kaplan, are husband and wife residing in New York, N.Y. For each of their taxable calendar years 1952 and 1953 here involved, they filed a joint income tax return in accordance with the cash receipts and disbursements method, with the then district director of internal revenue for the Lower Manhattan District of New York. The term "petitioner" in the singular, as used hereinafter, will have reference to the husband, Jacob M. Kaplan.

*Preliminary Facts re Petitioner's Transactions Prior to the Taxable Years Here Involved*

Petitioner was born on December 23, 1892. During the earlier years of his business life, he was engaged in manufacturing and shipping molasses, and also in department store and dry ice businesses. In about 1928 he disposed of his interests in said molasses business, and personally realized therefrom several million dollars—most of which he then placed in a family holding company named Kaplan Holding Corp. In addition to engaging in said commercial businesses, petitioner at all times material devoted a substantial part of his time to handling personal investments in securities and real estate; and in this connection, he was instrumental in organizing several corporations which engaged in acquiring, holding, and disposing of investments—some of which corporations he thereafter controlled and used as instrumentalities for handling many of his financial activities.

In 1930, petitioner caused a Delaware corporation to be organized, which is hereinafter called Navajo. The original name of this corporation was Kapmaur Corp., but in 1943, its name was changed to National Grape Corp., and in 1945 its name again was changed to Navajo Corp. The principal purpose of this corporation was to ac-

quire, hold, and dispose of stocks, bonds, and other types of investments; and in its income tax returns, its business was described as "Financial, etc." Its principal place of business was in New York City.

Shortly after Navajo was organized in 1930, it took over all the stock and certain assets of the above-mentioned Kaplan Holding Corp.; and thereafter it from time to time created several wholly owned subsidiary corporations to handle various phases of said investment and financial business. At all times here relevant until June 1953, petitioner owned all the outstanding shares of capital stock of Navajo; and also, he was its president, one of its three directors, and the person who dominated and controlled the operations and activities of both it and its wholly owned subsidiaries. During the taxable years 1952 and 1953 here involved, petitioner's stockholdings in Navajo were carried in his individual accounts at an original cost of approximately $4,900,000, and represented approximately 80 percent of his total personal assets.

During the period from 1941 through 1942, Navajo paid over numerous substantial amounts of money to petitioner, in the form of noninterest-bearing open account "advances," which petitioner used principally for making personal investments in securities which he expected to hold indefinitely. Portions of these advances were from time to time repaid; but by the end of November 1942, the accumulated unrepaid balance thereof was $730,000—and except for a repayment of $10,000 made in December 1943, said accumulated balance continued to remain outstanding on December 26, 1944. A summary of these advances, repayments, and unrepaid balances from January 1941 through December 26, 1944, is as follows:

| | Advances from Navajo to Kaplan | Repayments to Navajo by Kaplan | Excess of advances over repayments |
|---|---|---|---|
| 1941—January | $810,000.00 | | $810,000.00 |
| March | 100,000.00 | | 910,000.00 |
| July | | $90,000.00 | 820,000.00 |
| August | 45,000.00 | 10,000.00 | 855,000.00 |
| December | 53,737.04 | 165,000.00 | 743,737.04 |
| 1942—Balance Jan. 1 | | | 743,737.04 |
| February | 50,000.00 | | 793,737.04 |
| March | 10,303.78 | | 804,040.82 |
| April | 25,000.00 | | 829,040.82 |
| May | | 80,000.00 | 749,040.82 |
| June | 5,000.00 | | 754,040.82 |
| July | 50,450.00 | 105,000.00 | 699,490.82 |
| August | | 34,490.82 | 665,000.00 |
| September | 220,000.00 | | 885,000.00 |
| October | 400,000.00 | 541,362.96 | 743,737.04 |
| November | | 13,737.04 | 730,000.00 |
| 1943—Balance Jan. 1 | | | 730,000.00 |
| December | | 10,000.00 | 720,000.00 |
| 1944—Balance Jan. 1 | | | 720,000.00 |
| Balance Dec. 26 | | | 720,000.00 |

All of said advances were treated by Navajo on its books of account as non-interest-bearing open accounts receivable. They were not evidenced by any promissory note or other instrument of indebtedness; they were not secured by any collateral; and there was no arrangement between Navajo and petitioner as to any time for their repayment.

On February 24, 1944, petitioner wrote a letter to the Commissioner of Internal Revenue relative to said unrepaid balance of advances, in which he stated in substance and material part: (1) That he was the owner of all the stock of Navajo (then named National Grape Corp.) ; (2) that among the assets of said corporation there was included a "note receivable" from him (actually it was an open account receivable), representing principally moneys loaned to him "several years ago" of which the unrepaid balance was $720,000; (3) that Navajo proposed to cause the creation of a nonprofit membership corporation under New York law, and to make a contribution to such membership corporation of the value of $1 million, which would include the aforesaid "loan receivable" from him of $720,000, plus certain cash and securities; and (4) that in connection with such proposed contribution, it was further proposed to "alter the terms of the loan receivable" from him, so as to substitute therefor a non-interest-bearing note which would not become payable until his death, and which would be subject to reverter to Navajo or its successors or assigns, if at the date of petitioner's death his estate should be "less than a specified amount." Petitioner then requested in said letter that he be given a ruling as to whether Navajo would become entitled to a deduction for the proposed contribution of such note to the membership corporation, and also as to what would be the income tax consequences to him or to his estate.

Thereafter on March 23, 1944, the Commissioner of Internal Revenue made a written reply to said request for a ruling, and therein he stated in substance and relevant part that "based on the facts and circumstances set forth in your letter," it was the conclusion of his office: (1) That Navajo would not be entitled to deduct as a charitable contribution the amount of the proposed note to be executed by petitioner, because of the possibility that said note would revert to Navajo; (2) that "the mere transfer" of such note by Navajo to the proposed membership corporation would not "under the conditions indicated" have any income tax consequence to petitioner; and (3) that no opinion could be expressed as to the "consequences of future transactions" to petitioner's estate.

Following this correspondence, petitioner on December 26, 1944, executed and delivered to Navajo (then named National Grape Corp.) an instrument in the form of a promissory note, which bore no interest

and was made nonnegotiable by deletion of the words "the order of," that read as follows:

$720,000.00                                        December 26, 1944
  Upon the death of the undersigned after date I promise to pay to ~~the order of~~
NATIONAL GRAPE CORPORATION
SEVEN HUNDRED TWENTY THOUSAND AND No/100—DOLLARS
Payable at 55 Fifth Avenue, New York, New York.
Value received
No. ——— Due———                                  (S) J. M. KAPLAN

Also, at about this same time, Navajo and petitioner organized a tax-exempt membership corporation under the laws of Delaware, which was named the J. M. Kaplan Fund, Inc., and of which petitioner, his wife, and his brother were the sole members. Navajo then "Assigned, transferred and set over" to this fund the above-mentioned $720,000 note, subject, however, to the following conditions which Navajo set forth in a letter to the fund and which the fund accepted: (1) That the fund would hold said note until petitioner's death and thereafter until the same was paid, and would not assign or transfer the same without Navajo's consent; and (2) that said note would revert to Navajo, and would be reassigned and transferred to it by the fund, in the event that upon petitioner's death his net estate, after payment of all debts, taxes, funeral expenses, and expenses of administration, and also "after the deduction of the value of all residences and personal and household effects owned by him at the time of death, and all debts owing to him by his relatives," should not equal or exceed the sum of $2,100,000.

Petitioner has not at any time since made any payment of principal or of interest in respect of said non-interest-bearing advances from Navajo or in respect of said non-interest-bearing note held by the Kaplan Fund.

During the subsequent years 1945 through 1949, Navajo made additional large advances to petitioner, and petitioner made certain repayments and advances to Navajo—all being on open account and all being non-interest-bearing. The following table shows the net unrepaid balances thereof retained by petitioner at the end of the months indicated:

|          | 1945 | 1946 | 1947 | 1948 | 1949 |
|----------|------|------|------|------|------|
| Jan. 31  | $100,000.00 | $35,000 | | | |
| Feb. 28  | | | | | |
| Mar. 31  | 600,000.00 | | | $360,000 | |
| Apr. 30  | 600,000.00 | | $620,000 | 362,500 | |
| May 31   | 900,000.00 | 1 (200,000) | 635,000 | 375,000 | |
| June 30  | 676,000.00 | 1 (230,000) | 662,500 | 405,000 | |
| July 31  | 700,000.00 | | 662,500 | 210,000 | |
| Aug. 31  | 773.40 | 185,000 | 670,000 | 210,000 | $5,000 |
| Sept. 30 | | 1,465,000 | 715,000 | 168,000 | 10,000 |
| Oct. 31  | | 1,685,000 | 790,000 | 185,000 | 15,000 |
| Nov. 30  | 1 (160,000.00) | 471,500 | 795,000 | 185,000 | 335,000 |
| Dec. 31  | | | | | |

¹ The three figures in parentheses indicate balances owing by Navajo to petitioner. All others indicate unrepaid balances retained by petitioner on advances from Navajo.

After 1949, petitioner received no further open account advances directly from Navajo. But in 1950, he did receive similar open account advances from Navajo's wholly owned subsidiary, named Eastmanton Corp.; and also in 1951, 1952, and 1953, he received similar advances from another wholly owned subsidiary of Navajo, named Jemkap, Inc., which subsidiary is hereinafter more fully described. Said advances received from Eastmanton in 1950 consisted of $360,000 received on March 1, and additional advances made thereafter, against which there were certain repayments—so that on November 28, 1950, there was an unpaid balance of advances from Eastmanton to petitioner of $240,000. During December 1950 this balance was repaid with the proceeds of a bank loan hereinafter mentioned.

The reason that the above statements of advances from Navajo and Eastmanton show no unrepaid balances owing by petitioner on December 31 of any of the years 1946 through 1950, is this:

At the end of each of the years 1946 and 1947, petitioner made arrangements with a New York bank for a short-term loan in amount sufficient to cover the then unpaid advance from Navajo—each of which bank loans was evidenced by his promissory note bearing interest at rates of either 2 or 2½ percent and becoming payable in either 60 or 90 days. He then used the proceeds from these bank loans to repay to Navajo the existing unpaid balances of its advances as of the end of the particular years; and thereafter when the bank loans became payable after the beginning of the next following years, he obtained further non-interest-bearing advances from Navajo in amounts sufficient to satisfy the bank's interest-bearing loans.

At the end of the next year, 1948, petitioner eliminated the balance of advances by having Navajo pay him a dividend of $100,000, and by having his wife assume liability for the remainder of the advances.

And at the end of each of the following years, 1949 and 1950, he repaid the outstanding balance of advances, by again obtaining a short-term interest-bearing loan from a bank, and by then satisfying such bank loan after the first of the following year with further non-interest-bearing advances from one of Navajo's subsidiaries, Eastmanton or Jemkap, Inc.

By this procedure, what would otherwise have been long-extended periods of non-interest-bearing advances from one or another of petitioner's controlled corporations, were fragmented into a series of relatively shorter periods.

As regards all the above-mentioned open account advances from 1941 through 1950, petitioner, both in his above-mentioned letter to the Commissioner of Internal Revenue and also in the preparation of his income tax returns, regarded the advances to be "loans," and not distributions in respect of his stockholdings in Navajo; and he did not include any of them in his taxable income, or pay any income tax with

respect thereto. Also, the Internal Revenue Service did not at any time assert any deficiency in income tax with respect to such advances; and the periods within which any such deficiency could have been assessed or collected have long since become barred by the statutes of limitation.

*Facts re Petitioner's Transactions Related to the Taxable Years 1952 and 1953 Here Involved*

In September 1950 Navajo created under the laws of New York a new wholly owned subsidiary named Jemkap, Inc., which has hereinabove been mentioned. This subsidiary at all times engaged in acquiring, holding, and disposing of investments in securities, with particular emphasis on securities which were intended to be held for relatively short periods of time. Following its organization, it occupied the same premises as Navajo; Navajo's employees became its employees; and also it took over, and thereafter operated, Navajo's employees' pension fund. Navajo from then on confined its activities principally to holding permanent investments.

At all times here material, Navajo owned all of Jemkap's outstanding shares of capital stock; and petitioner, as in the case of the parent, was Jemkap's president and one of its three directors. Also petitioner, in his capacity of sole stockholder and chief executive of the parent Navajo, dominated and controlled Jemkap's business operations and affairs.

The amount of Jemkap's capital stock was at all times $100,000; and as of the close of each of its fiscal years ended on February 28 or 29, 1951, 1952, 1953, and 1954, it had accumulated deficits in earnings and profits, as follows:

| Fiscal year | Deficit in earnings and profits |
|---|---|
| 1951 (per consolidated return) | $40, 836. 34 |
| 1952 (per stipulation) | 41, 592. 05 |
| 1953 (per stipulation) | 101, 722. 37 |
| 1954 (per stipulation) | 1, 198, 330. 35 |

Prior to January 1, 1952, which is the first taxable year involved in the instant case, large open account advances were made to Jemkap by Navajo, and also by Navajo's wholly owned subsidiary, Eastmanton, and by petitioner—parts of which were repaid. A summary of the net amounts of such advances outstanding on January 1, 1952, is as follows:

*From Navajo*

| | |
|---|---|
| Advances to Jemkap prior to January 1952 | $5, 360, 000 |
| Repayments prior to 1952 | 2, 500. 000 |
| Net advances by Navajo | $2, 860, 000 |

*From Eastmanton*

| | | |
|---|---|---|
| Advances to Jemkap prior to 1952 | $540,000 | |
| Repayments prior to 1952 | None | |
| Net advances by Eastmanton | | $540,000 |

*From petitioner*

| | | |
|---|---|---|
| Advances to Jemkap in January and February 1951 | 650,000 | |
| Repayment in July 1951 | 650,000 | |
| Net advances by petitioner | | None |
| Total net advances to Jemkap outstanding on Jan. 1, 1952 | | 3,400,000 |

Subsequently in August 1952, Eastmanton was dissolved and all its net assets, including its claim for its above-mentioned advances to Jemkap, were transferred to its parent Navajo in complete liquidation; and thereafter Navajo alone held the claim against Jemkap for said advances. As of December 31, 1952, the net advances outstanding to Navajo on its own advances were $2,605,000; and the amount outstanding to it on the advances which had been made to Eastmanton prior to Navajo's taking over said subsidiary's claim for such advances was $650,000—making a total outstanding to Navajo of $3,255,000.

Petitioner, during the year 1952, was giving consideration to the planning of his testamentary estate. It was his desire to bequeath a substantial portion of such estate to the above-mentioned J. M. Kaplan Fund, which is the charitable membership corporation of which he, his wife, and his brother were the sole members. However he was then informed that, under New York law,[2] he could not effectively bequeath more than 50 percent of his estate to charity. Because of this situation, he thereupon formulated a "plan," which he believed would make it possible to circumvent said limitation of the New York law. The several steps of this plan were similar to, although in some respects materially different from, those which as hereinbefore found he had employed at the end of 1944 with respect to advances he had received from Navajo. In substance, these steps were as follows:

First, he would cause Jemkap to make non-interest-bearing open account advances to him, totaling approximately $1 million.

Thereafter, he would deliver to Jemkap, in "alteration" of its open account, a promissory note executed by him in an amount equal to such advances—which note would be non-interest-bearing and would not be payable until his death.

[2] N.Y. Deced. Est. sec. 17.

And then he would arrange for Jemkap to donate such promissory note of the amount of approximately $1 million to the J. M. Kaplan Fund as a charitable contribution.

The effect of such plan, if it proved to be successful, would be: (1) That he thereafter would be able to retain for his personal use, interest-free and throughout the remainder of his life, all the advances of approximately $1 million which he would have obtained from Jemkap; (2) that Jemkap, by assigning said promissory note to the J. M. Kaplan Fund, would thereafter have no claim against him for repayment of the advances; and (3) that the fund upon his death would, in his view, be in a position to claim from his estate the $1 million in the capacity of a creditor rather than as a legatee—thus avoiding the above-mentioned limitation of New York law.

In implementation of said plan, petitioner during the year 1952 caused Jemkap to make the following non-interest-bearing open account advances to him, which totaled $968,000, without any partial repayments thereof being made:

| | |
|---|---:|
| Feb. 29 | $3,275.37 |
| Mar. 10 | 400,000.00 |
| Mar. 11 | 15,000.00 |
| Apr. 28 | 2,724.63 |
| May 27 | 5,000.00 |
| June 12 | 5,000.00 |
| June 30 | 5,000.00 |
| July 29 | 5,000.00 |
| Aug. 27 | 5,000.00 |
| Sept. 11 | 5,000.00 |
| Sept. 26 | 5,000.00 |
| Oct. 9 | 5,000.00 |
| Oct. 10 | 5,000.00 |
| Dec. 11 | 1,000.00 |
| Dec. 17 | 1,000.00 |
| Dec. 19 | 500,000.00 |
| Total advances during 1952 | 968,000.00 |

None of these advances was either secured by any collateral, or evidenced by any instrument of indebtedness; none of them, as above stated, was interest bearing; and no date for repayment of the same was agreed upon. Also there was no written authorization for any of these advances, made by Jemkap's board of directors—because, as petitioner testified, "I was the formal authority."

The parties have stipulated that petitioner used the moneys so advanced to him by Jemkap primarily for investment in securities purchased in his own name; however the largest and last of said advances in the amount of $500,000 remained uninvested throughout the

remainder of the year 1952. Securities purchased in his own name were intended to be held permanently. Petitioner's personal balance sheet as of the end of 1952 shows that approximately $4,900,000 of his total assets of $5,375,000 (which would have been available for repayment of the advances) consisted of his investment in the capital stock of Navajo. He received no salary from any corporation during 1952; and his total gross income for that year was $80,267.80, consisting of interest, dividends, and capital gains—none of which was received from or in respect to any of the several corporations hereinabove mentioned. The amount of his personal living expenses for said year has not been established, but it has been stipulated that for the period from 1945 through 1953 the expenses of him and his wife, including taxes and all costs of living, aggregated approximately $1,600,000. He did at all times have extensive credit with New York banks from which he could have obtained interest-bearing loans in amounts equal to any or all of said advances, if he had elected either not to withdraw the same for his personal use, or if after having made the withdrawals he had elected to repay them.

On December 20, 1952, petitioner made an application to the Commissioner of Internal Revenue (similar to the above-mentioned application which he had made at the end of 1944) for a ruling with respect to his said unrepaid withdrawals from Jemkap. In this application he stated in relevant part as follows:

Among the assets of Jemkap, Inc., are included an account for loans receivable from myself, the present balance of which is $967,000.00 [the actual balance as above shown was $968,000].

\*       \*       \*       \*       \*       \*       \*

Jemkap, Inc., proposes now to make a contribution to The J. M. Kaplan Fund, Inc., of the aforesaid receivable from me. It is also proposed in connection therewith to alter the terms of the said receivable, by my issuing therefor to Jemkap, Inc., prior to the contribution, my promissory note for the amount of the debt, payable upon my death without interest.

\*       \*       \*       \*       \*       \*       \*

I should appreciate \* \* \* a ruling with respect to the income tax consequences, if any, to me or to my estate of (1) the change in the terms of the debt through the issuance of my said note and (2) the transfer, as a contribution, of the said note by Jemkap, Inc., to The J. M. Kaplan Fund, Inc.

Thereafter on April 1, 1953, the Internal Revenue Service issued a ruling to petitioner, which read in material part:

On the basis of the information submitted, it is the opinion of this office that, the change in the terms of the above-mentioned debt through the issuance of a promissory note and the subsequent transfer of the note by Jemkap as a contribution to The J. M. Kaplan Fund, Inc., will not result in any taxable income to you or your estate.

Subsequently, under date of May 15, 1953, petitioner delivered to Jemkap an instrument reading as follows:

$967,000                 May 15, 1953

Upon the death of the undersigned, after date I promise to pay to the order of JEMKAP, INC. Nine Hundred Sixty-seven Thousand and 00/100 Dollars

Payable at _____

Value received               Without Interest.

No. \_\_\_\_\_ Due\_\_\_\_\_

(S) J. M. KAPLAN

And on the same date, Jemkap endorsed this instrument to the order of the J. M. Kaplan Fund, "without recourse"; and it then delivered the same to the fund "as a donation," pursuant to a resolution adopted by its board of directors.

Petitioner has not at any time made any payment of principal or interest to the fund in respect to said note, nor has he ever repaid any of the above-mentioned advances which Jemkap made to him in the year 1952. Jemkap, after delivering said note to the Kaplan Fund, canceled its account for all of said advances which it had made to petitioner. It did not claim any deduction for said "donation."

During 1953, which is the second taxable year here involved, petitioner received from Jemkap further open account advances, as follows:

| | |
|---|---:|
| Jan. 8 | $82,000 |
| Jan. 15 | 15,000 |
| Feb. 12 | 2,500 |
| Feb. 19 | 2,500 |
| Mar. 6 | 9,000 |
| Mar. 17 | 5,000 |
| Total | 116,000 |

These amounts were repaid in full by petitioner to Jemkap, in two payments made on March 17 and April 3, 1953.

The only cash dividends which Navajo formally declared and paid at any time prior to the close of the taxable years here involved were as follows:

| Year ended Dec. 31— | Amount |
|---|---:|
| 1934 | $52,000.00 |
| 1935 | 22,000.00 |
| 1942 | 9,983.31 |

| Year ended Feb. 28 or 29— | |
|---|---:|
| 1945 | 50,000.00 |
| 1946 | 75,000.00 |
| 1948 | 50,000.00 |
| 1949 | 100,000.00 |
| 1950 | 10,000.00 |

Neither Jemkap nor Eastmanton ever formally declared and paid any dividend.

1. All of the advances which petitioner received from Jemkap during the calendar year 1952 were, in substance and reality, withdrawals from Navajo.

2. Each of these withdrawals from Navajo during 1952, which in total aggregated $968,000 and which have never been repaid, was intended by petitioner at the time of their withdrawal to be retained by him personally and indefinitely; and each constituted a distribution from Navajo in respect to its stock—which stock was all owned by petitioner.

3. The advances which petitioner received in the next year 1953, and which were all repaid shortly thereafter, did not constitute corporate distributions in respect to petitioner's stock.

The basic issue for decision herein, as we have hereinbefore shown, is whether the several sums aggregating $968,000 and $116,000 which Navajo's subsidiary Jemkap paid over in 1952 and 1953 to the petitioner (who was Navajo's sole stockholder) for his own personal use— constituted, in substance and reality, distributions from the parent Navajo in respect of its stock, which are taxable as dividends to petitioner to the extent of the latter corporation's earnings and profits.

In considering this issue we shall, because of differences in the pertinent facts of the 1952 and 1953 situations, deal with each of these situations, separately.

*I—The 1952 Corporate Advances*

The more salient features of the 1952 situation, as revealed in our Findings of Fact, are these:

During said year 1952, Navajo's newly created subsidiary Jemkap (which at all times had capital stock of only $100,000, and which was then in the process of accumulating large deficits in its earnings and profits that totaled more than $41,590 at the end of its fiscal year ended on February 28, 1952, more than $101,700 at the end of its fiscal year 1953, and over $1 million at the end of its fiscal year 1954) paid over to petitioner who was the parent Navajo's sole stockholder, in the form of non-interest-bearing "loans" of indefinite duration, 16 separate sums aggregating $968,000.

Such payment of these sums was not intended to, and did not, serve any corporate business purpose of either Jemkap or Navajo. Rather these sums were intended to be, and were, used by petitioner for his

own personal use in purchasing securities in his own name that he expected to hold as permanent investments. Petitioner at that time had extensive credit available to him at New York banks, which he could have employed, either for purchase of said personal investments without making the above-mentioned withdrawals from his controlled corporations, or which he could have employed for prompt repayment of the withdrawals, if he had chosen to do so.

Not 1 cent of any of said 16 separate withdrawals totaling nearly $1 million was ever repaid by petitioner, either in 1952 or during the subsequent period of approximately 11 years which preceded the trial of the instant case. Instead, during the year that the withdrawals were made, petitioner formulated, and shortly thereafter adopted, a plan under which no portion of any of these withdrawals would become repayable during the remainder of his life, and under which he could indefinitely retain the same, tax free, for his personal benefit.

This extraordinary set of circumstances has raised the question: Whether said sums which Jemkap so paid over to petitioner actually did represent bona fide loans from said subsidiary; or whether to the contrary, they represented, in substance and reality, indirect distributions from the parent Navajo in respect of its stock, which the petitioner through exercise of his unfettered control over both said parent and subsidiary corporations, caused to be paid to him through the medium of Jemkap, as a conduit and subservient instrumentality.

After considering and weighing all the evidence herein, we have concluded, and we have hereinabove found as an ultimate fact, that said advances were not bona fide loans from Jemkap; but rather, that they actually were constructive distributions from Navajo in respect of its stock. In arriving at this conclusion, we have given particular consideration to the following:

1. Jemkap, at the times when said sums were delivered to petitioner, was not in financial position to make, by its own volition, unsecured and interest-free loans of indefinite duration, totaling nearly $1 million, either to its parent corporation's sole stockholder or to any other person. Likewise, it was in no financial position to participate, through its own volition, in the plan which petitioner formulated, under which it would, and thereafter did: First, surrender all right to demand repayment of said sums at any time during the remainder of petitioner's life; secondly, "donate" all its claims to any eventual recovery of the same to the Kaplan Fund; and, finally, cancel and write off on its books of account all claims against petitioner in respect to the withdrawals.

2. Most of the liquid funds which Jemkap, in its above-mentioned financial condition, had available to it at the time when it paid over said sums to petitioner, had been supplied to it by its parent Navajo, and by its sister-subsidiary Eastmanton which had in August of that

same year dissolved and distributed its net assets and accounts to Navajo. The total of these available funds that Jemkap so possessed (all of which were subject to petitioner's control) was $3,400,000.

If Jemkap had required all these funds for its own operations, it is obvious that it was in no financial position to pay over nearly $1 million thereof to petitioner for his own personal use, without collateral security and without payment of interest; to thereafter surrender all right to obtain repayment of the same during petitioner's lifetime; and, subsequently, to cancel all claims against petitioner in respect to the same. And if, on the other hand, all of said available funds totaling $3,400,000 were not required by Jemkap for use in its own operations, then the normal corporate procedure would have been for it either to redeliver the unneeded portion thereof to Navajo, or to temporarily invest the same in short-term interest-bearing securities; rather than to pay over such funds to Navajo's sole stockholder interest free, for his personal use in purchasing securities that he expected to hold indefinitely.

3. Petitioner, as the record establishes, not only owned all the outstanding stock of Navajo (which in turn owned all the outstanding stock of Jemkap), but also he was the president of both these corporations, and he was the person who dominated and controlled the affairs and operations of both. He regarded both of these corporate entities to be instrumentalities through which he handled investments. Prior to 1950, it had been his practice to make numerous large withdrawals from Navajo for extended periods, in the form of non-interest-bearing advances; and after 1950, it had been his practice to make similar withdrawals, first from Eastmanton prior to its dissolution, and thereafter from Jemkap. In December 1944, his unrepaid balance of such advances from Navajo totaled $720,000; and thereupon he adopted a plan similar to, though in several respects different from, his later 1952 plan, under which he could retain said $720,000; without interest, throughout the remainder of his life.

As regards the 1952 advances totaling $968,000, all of these were made to petitioner without any written approval of Jemkap's board of directors, and we are convinced that, in the absence of petitioner's unfettered control over both Navajo and Jemkap, advances of such amount and character would not have been made by either of these entities in arm's-length transactions. Indeed, when petitioner was questioned about this situation during the course of his testimony, he frankly stated, "I was the formal authority."

4. We are convinced, and we have herein found as an ultimate fact, that petitioner's intention at the time when he received each of the 1952 advances totaling $968,000 was that he would not repay the same, but rather that he would retain said sums indefinitely for his personal use. One of the facts tending to support this conclusion is that it

was not necessary for petitioner to make said withdrawals in order to meet any temporary or nonrecurring emergency; instead he made them for the purpose of purchasing securities in his own name, that he expected to hold indefinitely as part of his personal investment portfolio. As before stated, he had credit at New York banks from which he could have obtained interest-bearing loans with which to make such personal investments, but he chose instead to make non-interest-bearing withdrawals from his controlled corporations for indefinite periods. Also, out of petitioner's total personal assets of $5,375,000, approximately $4,900,000 thereof was invested in the stock of Navajo; so that, except by liquidating part of his Navajo stock or making interest-bearing bank loans, he was without liquid funds with which to repay said withdrawals.

Still further support for our above conclusion that he did not intend to repay the withdrawals, is found in the facts that, at the time he received them, he had formulated the plan which he outlined in his letter of December 20, 1952, to the Internal Revenue Service—under which he would build up his withdrawals from Jemkap to approximately $1 million; thereafter "alter" the terms of its "account receivable," so as to make it possible for him to continue to retain the withdrawals throughout the remainder of his life, without interest; and also make it possible for Jemkap to "donate" nearly a million dollars to the Kaplan Fund in the form of his promissory note, and cancel its account with him.

It is significant that his largest 1952 withdrawal in the amount of $500,000 was made on the day next preceding that on which he sent said letter to the Internal Revenue Service describing his plan. And it is significant also, that not 1 cent of said withdrawals has ever been repaid.

5. We are further convinced that the portion of the above-mentioned plan under which petitioner caused Jemkap to contribute to the Kaplan Fund, the note representing the "account receivable" from him, was a fictitious maneuver that was nothing more than a sham. Not only, as we have before pointed out, was Jemkap in no financial position to give away a million-dollar account receivable, but the Kaplan Fund did not by said "donation" receive any asset or funds which it could in any way use for charitable purposes so long as petitioner lived.

Obviously, such plan of petitioner (which we believe fallacious) was to make it appear that, by such donation of the note, there would be created a claim against his testamentary estate, which the Kaplan Fund might in the future collect from his estate—thereby reducing the amount of the estate for estate tax purposes. But such claim would not be supported by any valid or adequate consideration, for petitioner's promissory note evidenced nothing other than distributions which

he had received indirectly from Navajo in respect to his stock (i.e., the receipt of dividends). In our view, such note would no more create a valid claim against petitioner's testamentary estate than if he had "donated" directly to the Kaplan Fund his own personal promissory note of the same face amount, which was not to take effect or become payable until after his death. In our view, the *primary* purpose of petitioner, in executing the promissory note and in having Jemkap "donate" the same to the Kaplan Fund, was merely to create a facade for a purported debtor-creditor relationship that never actually existed.

6. We are convinced, also, that the source of all the withdrawals which petitioner received in 1952 was the funds of Navajo which Jemkap then possessed through forbearance of its said parent corporation; and that petitioner, in the exercise of his unfettered control over both corporations, caused the $968,000 to be paid out to him through the medium of Jemkap, as a conduit and subservient instrumentality.

It is not necessary for us to consider, and we do not here pass upon, respondent's alternative contention that "the juridic persons of Navajo and Jemkap were, realistically, one and the same."

7. It is well settled that withdrawals made from a corporation by its controlling stockholder, without security and without interest, for his own personal use and benefit, and without any intention to make repayment, constitute distributions by the corporation with respect to its stock, and that such distributions are taxable to the shareholder as dividends to the extent of the corporation's earnings and profits. *Chism* v. *Commissioner*, 322 F. 2d 956 (C.A. 9), affirming a Memorandum Opinion of this Court; *Elliott J. Roschuni*, 29 T.C. 1193, 1201–1202, affd. 271 F. 2d 267 (C.A. 5), certiorari denied 362 U.S. 988; and *William C. Baird*, 25 T.C. 387, 393. The fact that the corporation may have charged such withdrawals to a loan account, is not determinative of the character of the withdrawals, for book records, though they should be given consideration, are not conclusive. *Elizabeth Lewis Saigh*, 36 T.C. 395, 421. See also *Doyle* v. *Mitchell Bros.*, 247 U.S. 179. The question as to the true character of the withdrawals is one of fact; and the answer must be determined from consideration and weighing all the pertinent facts and circumstances surrounding the transactions between the stockholder and the corporation. *Elliott J. Roschuni, supra* at 1202; *Harry E. Wiese*, 35 B.T.A. 701, affd. 93 F. 2d 921 (C.A. 8), certiorari denied 304 U.S. 562. And where the withdrawing party is in substantial control of the corporation, such control invites a careful scrutiny of the situation. *Elliott J. Roschuni, supra* at 1202; *W. T. Wilson*, 10 T.C. 251.

Also, where an individual is in control of two corporations, and he causes assets representing earnings and profits of one of his corpora-

tions to be shifted over to the other of his corporations, he will be treated as having received a dividend from the corporation from which the assets were shifted. *Helvering* v. *Gordon*, 87 F. 2d 663 (C.A. 8). The Eighth Circuit stated in said *Gordon* case, in here-pertinent part as follows:

The principle that substance and not form should control in the application of tax laws, * * * [citations omitted] is pertinent in this case. Tax laws deal with realities and look to the entire transaction * * * [citations omitted].

\* \* \* \* \* \* \*

The government cannot be controlled by the manipulations of the taxpayer's accounts, nor by the shifting of funds from one personally dominated corporation to another, in the enforcement of the tax laws. It is the Commissioner's duty to look through forms to substance and to assess the earnings of corporations to their shareholders in the year such earnings are distributed.

See also *Gregory* v. *Helvering*, 293 U.S. 465, affirming 69 F. 2d 809 (C.A. 2).

The respondent's issuance of the favorable ruling in 1953, in response to petitioner's request therefor, does not in our opinion conflict with or act as a bar to the result we have reached respecting the 1952 withdrawals. That ruling merely held that the transactions therein described—substitution of the petitioner's note for his open account liability to Jemkap, and Jemkap's contribution of the note to the J. M. Kaplan Fund—were not taxable events giving rise to income to the petitioner. Respondent has not now determined that said events, in themselves, were taxable. Rather his determination in the instant case goes back to petitioner's antecedent withdrawals which gave rise to the open account liability, and deals with the taxable character of the withdrawals at the time they were made—a matter with which the ruling was not concerned.

We hold that the withdrawals of 1952, aggregating $968,000, were corporate distributions to petitioner from Navajo with respect to its stock, and that such distributions are taxable as dividends to the extent of Navajo's earnings and profits.

## II—*The 1953 Corporate Advances*

Petitioner, as we have hereinabove found, withdrew $116,000 from Jemkap in six amounts over a 2-month period beginning in January and ending in early March 1953, and he made prompt repayment of the full amount thereof, in two installments on March 17 and April 3, 1953. He did not withdraw any further amounts during 1953.

In these circumstances, we are persuaded that said withdrawals were not intended to be more than temporary at the times made, and that petitioner did at said times intend to make prompt repayment thereof. We have hereinabove found as an ultimate fact, and here hold, that

such withdrawals were not corporate distributions in respect of stock. Accordingly, we decide the question respecting said 1953 amounts in favor of the petitioner.

### III—Navajo's Earnings and Profits

Section 115(b) of the 1939 Code provides that every distribution made by a corporation "is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits." In determining the source of a distribution, consideration should be given, first, to the earnings and profits of the taxable year; and, second, to the accumulated earnings and profits, but only in the case where, and to the extent that, "the distributions made during the taxable year are not regarded as out of the earnings or profits of that year." Regs. 118, sec. 39.115 (b)–1(a).

It has been stipulated that Navajo's corrected taxable income for its fiscal year ended February 28, 1953 (which embraces 10 months of the calendar year 1952 when the distributions were made to petitioner), was $88,943.57. After giving appropriate recognition to Federal income taxes paid and certain tax refunds received, Navajo's *current* earnings and profits for fiscal 1953 were $84,377.99. To this extent at least, the $968,000 distributed to petitioner by Navajo with respect to its stock, is taxable as a dividend. And as to the remainder of $883,622.01 ($968,000 less $84,377.99), this will be taxable as a dividend to the extent of Navajo's *accumulated* earnings and profits.

The parties have stipulated that Navajo had a *deficit* in its accumulated earnings and profits, per books, at March 1, 1952, of $625,900.10. Both parties agree that this figure is not correct, and that adjustments thereto must be made in order that Navajo's true accumulated earnings and profits be correctly reflected. They agree as to certain adjustments, but they disagree as to other adjustments claimed by one party or the other.

The parties agree that a certain charge which Navajo made to its earnings and profits in 1942 in the amount of $14,693.12 was improper and should be eliminated. Also, as regards another adjustment, the parties agree that when Eastmanton was dissolved and its assets and accounts were transferred to Navajo in complete liquidation at August 18, 1952, its accumulated earnings and profits were $1,082,854.03; and that when these earnings and profits were so succeeded to by Navajo, they thereupon became a part of Navajo's earnings and profits. See *Commissioner* v. *Sansome*, 60 F. 2d 931 (C.A. 2). The result is that, when effect is given to these two agreed adjustments, Navajo's earnings and profits became $471,647.05, as adjusted to this point.

Respondent has recognized on brief, in response to petitioner's claim, that Navajo's credits to its earnings and profits in 1945 and 1946 of $249,795 and $414,550.43 (which were described on Navajo's books as representing "the excess of the market value over cost of securities donated to charity") were improper and should be eliminated. We agree with the correctness of such adjustment. Giving effect to these two eliminations, we find that Navajo's earnings and profits, as adjusted to this point, reflect a deficit in its accumulated earnings and profits of $192,698.38.

We turn next to the disputed adjustments.

1. During the year 1941, Navajo charged its earnings and profits in the amount of $854,507.78, which it described in its accounts as "Federal income taxes—predecessor companies." The parties have stipulated that "it is not possible to ascertain from the available books and records to what such tax payment was attributable." There was no entry made on Navajo's earnings and profits account during 1941 or prior thereto, reflecting an assumption of the earnings and profits of any predecessor company or companies.

The respondent contends, and we agree, that this charge should be eliminated. It is our belief that unless the earnings and profits of Navajo were augmented by the accumulated earnings and profits of its predecessor companies (for example, as it has been agreed must be done in the situation where Eastmanton's assets and accounts were transferred to Navajo in 1952), it was improper to charge and thereby decrease the earnings and profits of Navajo by the amount of the Federal income tax liabilities which it paid with respect to the income of said other companies. After effect is given to elimination of this $854,507.78 charge, Navajo's earnings and profits, as adjusted to this point, become $661,809.40.

2. The second disputed adjustment relates to a charge to Navajo's earnings and profits, which it made in its fiscal year ended February 28, 1945, in the amount of $947,379.79—representing an "excess of contributions" over the amount of contributions deducted for Federal income tax purposes.

During fiscal 1945, Navajo donated to the Kaplan Fund, in the circumstances hereinabove described, the promissory note which it had received from petitioner in the face amount of $720,000, and it also donated to an unidentified charity certain shares of stock in a corporation known as Vertientes Sugar Co. It claimed no deduction on its income tax return with respect to the donation of said note of petitioner; but it did claim and was allowed, in respect of said other contribution, a deduction of $22,415.21 (5 percent of its net income, computed without regard to the deduction for contributions). Nav-

ajo charged its earnings and profits account in the above-mentioned amount of $947,379.79, computed as follows:

| | | |
|---|---:|---:|
| Petitioner's note | | $720,000.00 |
| Vertientes Sugar Co. stock | $249,795.00 | |
| Less: Deduction allowed | 22,415.21 | 227,379.79 |
| Total | | 947,379.79 |

Petitioner's promissory note, as we have hereinabove found as facts, was non-interest-bearing; could not be assigned or transferred by the donee-fund without Navajo's consent; was not payable until after Kaplan's death; and was required to be reassigned and transferred back to Navajo by the fund in the event that petitioner's net testamentary estate (as further reduced by the value of all residences and personal and household effects owned by him at the time of his death, and as also reduced by the amount of all debts owing to him by his relatives) should not equal or exceed $2,100,000.

Respondent contends that the above-mentioned total charge of $947,-379.79 should be eliminated. We agree, insofar as the $720,000 allocable to petitioner's note is concerned, but we disagree, for reasons hereinafter shown, as to the portion of said total charge that is allocable to the Vertientes Sugar Co. stock.

Where (as here) property other than money is contributed to a charitable organization, the quantum of the contribution is to be measured by the fair market value of the property at the time of the contribution. Regs. 111, sec. 29.23(o)–1. To the extent that a contribution in such property is not allowed as a deduction for Federal income tax purposes (as was the situation respecting petitioner's note), the excess of the fair market value over the amount allowed as a deduction is properly chargeable to the earnings and profits of the corporate donor. See R. M. Weyerhaeuser, 33 B.T.A. 594, 597; I.T. 3758, 1945 C.B. 159, 160; and I.T. 3764, 1945 C.B. 188, 191.

As regards petitioner's note, we are convinced that the fair market value thereof at the time of its contribution in 1944 was nowhere near its face amount of $720,000. The facts regarding its non-interest-bearing character, its nonpayability until after petitioner's death, and the several conditions attached to its ever being paid at all, make it manifest that whatever fair market value it had (if any) was minimal. Indeed, the Internal Revenue Service disallowed any deduction in respect to the note as a charitable contribution, because it was to revert to Navajo or its successors or assigns, if all the above-mentioned conditions precedent were not thereafter met; and this same situation had the effect of causing the fair market value of the note, at the time of its "contribution," to be indeterminable. Accordingly, we sustain the

respondent's position that the $720,000 charge to Navajo's earnings and profits was improper, and should be eliminated.

Regarding the fair market value of the gift of the Vertientes Sugar Co. stock, respondent (who has the burden of proof on this point) has presented no evidence, and we therefore do not disturb the value which Navajo ascribed to said stock in its income tax return.

Giving effect to these last-mentioned adjustments, we find that Navajo's earnings and profits, as adjusted to this point, are $1,381,809.40.

3. Next, we consider a contention of petitioner that Navajo's earnings and profits should be reduced by the amount of $720,000, representing the net withdrawals by petitioner from Navajo during 1941 and 1942, for which he gave Navajo his above-mentioned promissory note in 1944. Petitioner has suggested that if we decide, as we have, that the 1952 withdrawals (which were all made in a single year and against which no repayments were made) were distributions in respect of stock, then the various net withdrawals made over the period from 1941 through 1944 should similarly be regarded as distributions in respect of stock; and that under such hypothesis, a single adjustment for all said 1941–44 net withdrawals should be made in reduction of Navajo's earnings and profits for the year 1944.

Petitioner has offered no evidence whatever in support of his above contention, which would enable us to determine as a fact that it was his intention not to repay any of the unrepaid portions of withdrawals in the various years when they were made. To the contrary, he represented to the Commissioner of Internal Revenue in his letter of February 24, 1944, that these amounts represent "principally moneys loaned to me several years ago, on account of which payments have been made, present balance of which is $720,000.00"; and also he did not treat these moneys on his income tax returns as being dividends, nor did he pay any income tax on them as dividends. The Commissioner did not disturb such treatment by petitioner, and the period within which he might have made any adjustment thereto has long since become barred by the statute of limitations. In these circumstances and in the absence of any evidence presented by petitioner that his prior representation and treatment were untrue or erroneous, we hold that the suggested adjustment is not allowable.

4. Finally, the respondent contends that the Kaplan Holding Corp. had at least $1 million of accumulated earnings and profits which should have been taken over by Navajo in 1930 when it acquired the Holding Corp. stock in a stock-for-stock exchange. The short answer is that the respondent, who had the burden of proof on this point, adduced no evidence that would permit us to fix the amount (if any)

of the accumulated earnings and profits of the Holding Corp. at the time of said exchange, and we therefore reject the respondent's said contention. In this circumstance, there is no necessity for us to pass upon the petitioner's countercontention that the Holding Corp.'s accumulated earnings and profits (if any) would not have gone over to Navajo in a stock-for-stock exchange.

In summary, we find and hold, on the basis of all the foregoing, that the amount of Navajo's *current* earnings and profits for its fiscal year 1953 was $84,377.99, and that the amount of its *accumulated* earnings and profits as of February 28, 1953, was at least $1,381,809.40. Accordingly we further hold that the entire amount of Navajo's distributions to petitioner in his calendar year 1952, with respect to its stock—which we have hereinabove found and held to be $968,000—is taxable to petitioner as a dividend. Sec. 115, 1939 Code.

## IV—Miscellaneous Issues

1. Respondent determined that, for 1952, petitioners are liable for an addition to tax for substantial underestimation of estimated tax, under section 294(d)(2) of the 1939 Code.

Petitioner estimated his 1952 tax liabilities to be $12,000. As the result of our decision that he must include in income for 1952, $968,000 as dividend income, his corrected total tax liability for that year is in excess of $880,000. Clearly he underestimated his estimated tax. The application of section 294(d)(2) is entirely mathematical, and any necessary adjustment will be given effect in the computation to be made herein under Rule 50.

2. Petitioner and his wife reported in their income tax return for the year 1953 total medical expenses of $4,513.43; and since this amount exceeded 5 percent of their reported adjusted gross income by $2,500, they claimed a medical deduction for such excess under section 23(x). The respondent disallowed this claimed deduction on the sole ground that, after certain determined adjustments to petitioners' income (some of which adjustments were not contested in the petition to this Court), no portion of the medical expenses exceeded 5 percent of petitioners' corrected adjusted gross income. Principal among said adjustments to income determined by respondent in his statutory notice of deficiency was that petitioner had received additional dividend income of $116,000 in 1953. We however have not sustained the respondent as to this 1953 adjustment. The amount of the medical deduction allowable, after giving consideration to the other adjustments not contested in this Court, will be determined in the computation to be made herein under Rule 50.

*Decision will be entered under Rule 50.*