*Decision will be entered under Rule 50.*

GEORGE R. TOLLEFSEN AND MARGARET A. TOLLEFSEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1743–67.  Filed July 24, 1969.

*Murray Kurman,* for the petitioners.
*Richard J. Mandell,* for the respondent.

674

678

OPINION

RAUM, *Judge:* The sole issue is whether the net withdrawals made by petitioner George R. Tollefsen from Tollefsen Manufacturing during 1961 constituted loans, as contended by the petitioners, or distributions of dividends, as contended by the Commissioner. Resolution of this issue requires us to determine first whether Tollefsen's withdrawals were intended as bona fide loans to him, or as permanent withdrawals. If the withdrawals were intended to be permanent, we must further determine whether petitioners received dividends notwithstanding they were not record owners of stock in Tollefsen Manufacturing.

Essential to our first inquiry is the determination of whether repayment of the advances was in fact contemplated by the parties at the time the withdrawals were made. See *Leach Corporation,* 30 T.C. 563, 579; *Hoguet Real Estate Corporation,* 30 T.C. 580, 598; 2554–58 *Creston Corp.,* 40 T.C. 932, 936–937; *Jacob M. Kaplan,* 43 T.C. 580; *Wiese* v. *Commissioner,* 93 F. 2d 921, 923 (C.A. 8), certiorari denied 304 U.S. 562; *Carl L. White,* 17 T.C. 1562, 1568.

After consideration of all the evidence, we conclude that at the time of the withdrawals here in issue Tollefsen did not intend to repay such amounts to Tollefsen Manufacturing.

Tollefsen Manufacturing became inactive upon the sale of its assets and manufacturing rights to Anchor Abrasive Corp. in March of 1960. Shortly thereafter, Tollefsen began making systematic cash withdrawals from that corporation which, by the end of 1961, left the corporation virtually without any assets other than the "notes" given it by him in respect of the withdrawals. These "notes" were non-inter-

est-bearing and no interest was at any time paid by Tollefsen to the corporation for the use of the funds withdrawn.

Tollefsen attempted to explain his withdrawals by arguing that it was necessary for him to effect "loans" from his corporation in order to "carry on" its interests during the period in which its activities were restricted by the terms of the sales agreement entered into with Anchor Abrasive Corp. But it is clear from the terms of the sales agreement that Tollefsen himself was personally bound by the identical limitations to which Tollefsen Manufacturing was subject during the 5-year period, and so far as those limitations were concerned he had no greater right or freedom to "carry on" its business interests in his personal capacity than as its agent using its own funds on its behalf without withdrawing them as loans to himself. His explanation that he withdrew the funds because of those contractual restrictions was completely spurious, and greatly shook our confidence in his testimony. We simply did not believe it to the extent that it sought to establish an intention to repay the funds withdrawn.

Moreover, rather than using these funds to "carry on" the business interests of Tollefsen Manufacturing, Tollefsen expended most of the funds withdrawn in his own behalf to acquire personal interests in various business ventures. Tollefsen did not assign any of these interests to Tollefsen Manufacturing nor is there any convincing evidence that he intended to do so. While some amounts were spent by him for trips to Norway to explore new methods of synthesizing mineral shot— an activity of interest to Tollefsen Manufacturing—it is notable that the only tangible result of these trips was Tollefsen's acquisition of a *personal* interest in Nordic Ship Blasting, Inc., A.S. The nature of the business of this corporation does not appear in this record, and the interest therein purchased by Tollefsen has never been assigned to Tollefsen Manufacturing.

Our finding that Tollefsen did not intend to repay the amounts withdrawn is further supported by the fact that as of the date of the hearing herein he has made no formal repayments in respect of the amounts allegedly "borrowed" during 1960 and 1961. Those credits (aggregating $11,916.80) to Tollefsen's account on the books of Tollefsen Manufacturing which were treated as repayments in respect to Tollefsen's withdrawals (as further indicated by the cancellation of two notes given by Tollefsen with respect to withdrawals made in 1960) were unimpressive in light of the much larger net amounts withdrawn from the corporation ($52,476.37) during 1960 and 1961 and the period

of time within which Tollefsen has had the unrestricted use of these funds. Moreover, these credits on the books of Tollefsen Manufacturing, beginning November 30, 1964, were made *after* the petitioners had notice of an audit by the Internal Revenue Service, which audit actually began on or about June 4, 1964—a circumstance that goes far to weaken these "repayments" as persuasive evidence of a pre-existing intention to repay the amounts withdrawn. Cf. *Atlanta Biltmore Hotel Corp.* v. *Commissioner*, 349 F. 2d 677, 680 (C.A. 5).

Tollefsen has argued that his intention to repay the advances in issue is evidenced by the fact that he was at all times financially able to repay the withdrawals. The short answer to this contention is that he offered no credible explanation of why he did not make such repayment. No evidence was presented to show a plan of repayment and little other than Tollefsen's own self-serving testimony suggested that at the time of withdrawal he intended to repay the advances, testimony that we did not find convincing.

Tollefsen has also argued that his withdrawals were "in effect" repaid in full prior to his notice of investigation by the Internal Revenue Service when, during early 1964, he made assignments of his interests in Port O'Call Corp. and other "claims" to Tollefsen Bros., the parent of Tollefsen Manufacturing. He argues that since these claims were in excess of the amounts allegedly due on the withdrawals from Tollefsen Manufacturing his "loans" were in effect repaid. This argument is completely without merit. The assignments made to Tollefsen Bros., no matter how voluntary or timely with respect to investigations of the Internal Revenue Service, were not intended to discharge Tollefsen's alleged obligation to Tollefsen Manufacturing, a separate corporation, and the parties did not in any way treat the assignments as such. At best this argument suggests that Tollefsen could have made repayments to Tollefsen Manufacturing had he intended to do so; that he did not, however, is further indication that he did not in fact intend to repay the advances in issue.

Tollefsen attempts to make much out of the fact that he had made advances of some $170,000 to six of his corporations, thereby suggesting a pattern of bona fide reciprocal loans to and from his corporations. The difficulty with this contention is that there was no showing of any such pattern of reciprocal loans of consequence to *this* corporation, Tollefsen Manufacturing, particularly in the light of the fact that the so-called loans by this corporation to him in effect merely drained this corporation of its funds after it had become inactive

when there was no convincing evidence that it would ever become active again.[1]

Having determined that Tollefsen's withdrawals from Tollefsen Manufacturing were not loans, we conclude that the amounts withdrawn from that corporation were in effect dividends from Tollefsen Bros., petitioners' wholly owned corporation. It is clear that Tollefsen exercised complete control over Tollefsen Manufacturing through the ownership of all the stock in its parent company Tollefsen Bros. He was able to siphon off the assets of Tollefsen Manufacturing only because petitioners owned 100 percent of the stock of Tollefsen Bros. and the latter owned 100 percent of the stock of Tollefsen Manufacturing. In every real sense the funds in question came to him *through* Tollefsen Bros., notwithstanding that two steps (a transfer from Tollefsen Manufacturing to its parent, followed by a transfer from the parent to Tollefsen) were compressed into a single step, the transfer of funds directly to Tollefsen. We find, therefore, that the withdrawals in issue were in substance distributions to Tollefsen Bros. from its subsidiary Tollefsen Manufacturing, with a resulting constructive dividend to petitioners, the sole shareholders of Tollefsen Bros. Cf. *Ben R. Meyer*, 45 B.T.A. 228; *Jacob M. Kaplan*, 43 T.C. 580; *Sidney L. Olson*, 48 T.C. 855, 870–871, and supplemental opinion 49 T.C. 84; but cf. *Howard M. Taylor et al.*, 14 B.T.A. 863.

Finally, Tollefsen argues that since the Commissioner accepted his treatment of the 1960 withdrawals as "loans" the Government is now estopped or otherwise precluded from claiming that the 1961 withdrawals were dividends. We disagree. Regardless of whether the Commissioner had the opportunity to treat the withdrawals in both years in the same manner it is well established that the Commissioner is not subject to any estoppel or similar disability if he does not do so. *Dixon* v. *United States*, 381 U.S. 68; *Automobile Club* v. *Commissioner*, 353 U.S. 180; *Caldwell* v. *Commissioner*, 202 F. 2d 112, 115 (C.A. 2); *Chester Farrara*, 44 T.C. 189, 191. The mere fact that petitioners may have obtained a windfall in 1960 does not entitle them to like treatment in 1961.

*Decision will be entered for the respondent.*

---

[1] In addition, it is far from clear that Tollefsen had made bona fide loans aggregating $170,000 to his other corporations. To be sure, he testified in conclusory terms, without meaningful amplification, that he made such loans, but although we have found that he made advances in such amount, we are not prepared to accept his characterization of such advances as loans. They may well have been capital contributions, and in the absence of any satisfactory clarifying testimony, we are not required to accept Tollefsen's conclusory description of such advances. The burden was on him, and we need not indulge in speculative assumptions in his favor.